STATE OF NORTH CAROLINA v. EUGENE JOHNNY WILLIAMS

No. 506A07

(Filed 11 December 2009)

## 1. Criminal Law— appointed attorneys removed—one of original attorneys reappointed—no error

The trial court did not err in a first-degree murder prosecution by not removing one of defendant's appointed attorneys after a superior court judge ordered that the original attorneys be removed and IDS reappointed one of the original attorneys. The court's order simply allowed defendant's motion to have counsel removed and did not implicitly or explicitly order that neither of the original attorneys be reappointed.

## 2. Criminal Law— request for substitute counsel—defendant's letter not sufficient

A first-degree murder defendant's letter to the trial court did not clearly constitute a request for substitute counsel and the trial court was not required to conduct a hearing as argued by defendant. Even if a hearing should have been held, there was not a conflict sufficient to remove the attorney from the case.

**3. Criminal Law— represented defendant—pro se motions not allowed**

The trial court did not err by "summarily denying" a first-degree murder defendant's pro se motions where defendant was represented by appointed counsel and therefore was not allowed to file motions on his own behalf. A statement to the court by counsel that the pro se motions needed to be ruled upon was not an adoption of the motions.

**4. Evidence— police officer's opinions—admissibility**

The trial court did not err in a first-degree murder prosecution by admitting certain testimony from a police officer where defendant contended that it was an impermissible lay opinion. The testimony explained the officer's observations and was not an opinion, or was rationally based on the officer's perception and experience and was helpful to determination of a key issue.

**5. Evidence— testimony by officers—statements made by others—admissible as corroboration**

The trial court did not err in a first-degree murder prosecution by admitting certain testimony for corroborative purposes. The testimony of one officer tracked the testimony of the fiancée of a victim about a telephone call received by the victim, and testimony from a detective about defendant's statements to his cellmate generally tracked the testimony given by the cellmate. Any prejudicial effect from the language of the statements was mitigated by the admission of other testimony, and the jury was instructed on corroborative purposes.

**6. Homicide— first-degree murder—evidence sufficient—viewed in light most favorable to State**

The evidence of first-degree murder was sufficient for a reasonable person to find defendant guilty beyond a reasonable doubt and sufficient for the jury to finding the aggravating circumstance of course of conduct. Defendant on appeal attempted to interpret the evidence in the light most favorable to him, detailing other plausible explanations for the evidence; however, contradictions or conflicts are resolved in favor of the State on a motion to dismiss for insufficient evidence. Evidence not favorable to the State is not considered.

STATE v. WILLIAMS

[363 N.C. 689 (2009)]

**7. Sentencing— capital—jurisdiction—different judges at guilt and penalty phases**

The trial court did not lack jurisdiction to enter a judgment sentencing defendant to death for first-degree murder because different judges presided over the guilt and sentencing phases of defendant's murder trial where a mistrial was declared in the original sentencing proceeding because defendant attacked one of his appointed attorneys. The superior court's jurisdiction over the subject matter of defendant's case was established when defendant was indicted for a felony, jurisdiction over the penalty phase was established when defendant was convicted of a capital offense, and the trial court was not divested of its subject matter jurisdiction because the same judge did not preside over the guilt and penalty phases of defendant's capital trial.

**8. Sentencing— capital—jurisdiction—different juries at guilt and sentencing phases**

The sentencing jury in a capital sentencing proceeding did not lack jurisdiction to recommend a sentence of death because it was not the same jury that returned the guilty verdict in the guilt phase of defendant's first-degree murder trial. N.C.G.S. § 15A-2000(a)(2) sets out procedure, not jurisdiction.

**9. Sentencing— capital—second proceeding—judgments out-of-term and out-of-session**

Entering judgments imposing a sentence of death out-of-term and out-of-session did not deprive the trial court of jurisdiction over a delayed capital sentencing proceeding where a mistrial was declared in the first sentencing proceeding because defendant attacked one of his appointed attorneys. New counsel needed to be appointed with time for the new counsel to prepare; defendant is not prejudiced by error resulting from his own conduct.

**10. Jury— capital trial—right to be present—jury pool selection**

A first-degree murder defendant's right to be present at all of the proceedings of his capital trial was not violated when the deputy clerk selected forty-eight prospective jurors from the pool in the jury assembly room, outside of defendant's presence. The random segregation of the entire jury pool so that it could be split among defendant's proceeding and other matters being handled at the courthouse was a preliminary administrative matter at which defendant did not have a right to be present.

**11. Sentencing— evidence—possession of victims' property after murders—admissibility**

The trial court did not err during a capital sentencing proceeding by admitting evidence that defendant had items that belonged to the victims after the murders even though he had been acquitted of robbery. The evidence was not offered to prove that defendant had robbed his victims, but to prove the course of conduct aggravating factor.

**12. Sentencing— death penalty—proportionatity**

A death penalty was proportionate where defendant murdered two people, was convicted on the basis of premeditation and deliberation, and the killings appeared to be motivated by revenge for failure to pay for a motorcycle deal, which prevented defendant from being able to make bail during an incarceration.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing a sentence of death entered by Judge Thomas H. Lock on 1 May 2007 in Superior Court, Cumberland County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court 8 September 2009.

*Roy Cooper, Attorney General, by Daniel P. O'Brien and William B. Crumpler, Assistant Attorneys General, for the State.*

*Staples S. Hughes, Appellate Defender, by Daniel Shatz, Assistant Appellate Defender; and Ann B. Petersen for defendant-appellant.*

BRADY, Justice.

On 8 December 2004, defendant Eugene Johnny Williams was convicted of the first-degree murders of Nicholas Gillard and Cedric Leavy. Following these convictions, the trial court declared a mistrial only as to the penalty proceedings. New counsel was appointed for defendant, and on 1 May 2007, a different jury returned a binding recommendation that defendant be sentenced to death for both murders. We find no error in defendant's convictions or sentences.

## BACKGROUND

Defendant was detained pursuant to a possession of stolen goods charge from 4 June 2001 until 5 October 2001. Defendant was

unable to raise the bail money to be released. Defendant informed another inmate, Jimmy Locklear, that he could not raise the bail money because an unnamed person had not paid for a motorcycle that defendant had stolen and sold to him. Inmates who spent time with defendant that summer heard defendant say that upon release he was going to "get" the person who owed him money and "f\*\*\* him up."

Robin Gillis, an inmate who spent time with defendant in the Cumberland County Detention Center, had worked for Gillard pressure washing houses and trucks. On one occasion, Gillis had observed money passing between defendant and Gillard. Defendant told Gillis that he had been trying to contact Gillard to collect the $1400 owed so that he could make his $1100 bail. Defendant appeared outraged that Gillard would not communicate with him while he was in the detention center. Defendant told Gillis he was going to kill Gillard when he was released.

Upon his release on 5 October 2001, defendant visited Diana Powell. Powell testified that defendant made a telephone call from her residence to Gillard's residence. Telephone records confirm this testimony, and also show that defendant attempted to contact Gillard seven more times over the next several days. A message left by defendant on Gillard's voice mail was retrieved by law enforcement. The message said:

Hey, Nick, this is J. I got your ZX-12. It's brand new. I got the paperwork and the keys to it. Just call or come by the crib Saturday night. I'll let you check it out. It's still in the "m\*\*\*\*\*-f\*\*\*\*\*\*" crate. Come by yourself, and don't bring nobody to my crib.

On Tuesday morning, 9 October 2001, Gillard telephoned his friend Cedric Leavy and drove to Leavy's residence to pick him up. Gillard honked the horn and Leavy went out to meet him, leaving his mobile telephone on the table. Sharon Cogdell, Leavy's fiancée, attempted to contact Leavy by calling Gillard's mobile telephone. Gillard informed her that they were busy and Leavy would call her back. Telephone records indicate that Cogdell's call to Gillard was placed at 10:13 a.m., and that Gillard's mobile phone was within a three-mile radius of the cellular tower closest to defendant's residence. The signal from the tower to Gillard's telephone traveled through the southwest panel of the tower, the quadrant in which defendant's residence was located. Cogdell attempted many other

STATE v. WILLIAMS

[363 N.C. 689 (2009)]

calls late into the night, but they were not answered. On 10 October 2001, she informed the police that Leavy and Gillard were missing.

Also on 10 October 2001, Esther Locklear noticed an unfamiliar vehicle in her neighborhood in rural Cumberland County. After her son observed a body covered with a blanket in the backseat of the vehicle, Ms. Locklear contacted law enforcement. The vehicle was a burgundy Chevrolet Malibu four-door sedan with a plate registered to Gillard. Law enforcement secured the area and began an investigation. There were no prints on the ground or tire tracks that were thought to be of any evidentiary value; however, a white crystalline substance on the exterior of the vehicle appeared to be dried soap suds.

The body in the backseat was an African-American male who was six feet, two inches tall and weighed 430 pounds. It appeared from ropes tied around his wrists and then tightly secured around the front seat that his body had been winched in the vehicle. The body was determined to be that of Leavy. Law enforcement found Gillard's body in the trunk. The autopsies showed that both men had suffered contact and near-contact bullet wounds to the head. Gillard sustained three gunshot wounds, and Leavy received six. Three projectiles recovered from the bodies were determined to have been fired from the same weapon, a nine millimeter caliber firearm with a barrel containing nine lands and grooves with a left-hand twist. Only one manufacturer made such a firearm, and the murder weapon was either a Hi-Point nine millimeter Model C pistol or a Model 995 carbine rifle.

A search of defendant's residence revealed five spent nine millimeter shell casings in the dirt driveway and yard. In the backyard, near the patio, law enforcement observed two areas of roughly twenty to thirty square feet each where fresh soil had been spread over burned grass. The ground smelled of gasoline and putrid blood. Two blood-stained pieces of concrete were found buried several inches in the ground at the burn sites. Testing revealed the blood to be human.

Investigators also found two spent nine millimeter projectiles in the burned ground. It was determined that the two projectiles had been fired through a barrel with a left-hand twist and with nine lands and grooves; that is, they had been fired from a Hi-Point nine millimeter Model C pistol or Model 995 carbine rifle, as had the projectiles found in the victims' bodies. Luminol spraying revealed two

tracks of blood coming from the burned areas to the right and running through the yard, where they abruptly stopped.

Jerard Vinson testified that in October 2001 defendant asked him to pawn a ring because defendant did not have identification. Vinson pawned the ring, which was gold and had a black onyx stone, on 17 October 2001. Law enforcement later recovered the ring from the pawnshop. Gillard's ex-girlfriend testified the ring looked like the one Gillard wore and was wearing on the morning of his disappearance. The pawnshop manager testified that the retail portion of the store was the area's sole distributor of this brand of ring, and that Gillard had originally bought a gold and onyx ring there on 10 February 2001 for three hundred dollars.

Defendant presented no evidence at the guilt phase of his trial. The jury returned verdicts of guilty of first-degree murder of both Gillard and Leavy, but returned a verdict of not guilty as to defendant's alleged robbery of Gillard. The trial court dismissed the robbery charge as to Leavy.

Following the verdicts, both of defendant's attorneys, Carl Ivarsson and George Franks, were allowed to withdraw as counsel following defendant's physical attack on Franks. The trial court then declared a mistrial as to the penalty proceeding.

In 2007 a new jury was empaneled for the sentencing proceeding of defendant's trial. The State offered substantially the same evidence as it had presented in the guilt phase. In addition, the State offered victim impact evidence from Pamela Leavy, who was Leavy's older sister, and Sharon Cogdell, Leavy's girlfriend. Victim impact evidence as to Gillard's death was presented through testimony of Toni Washington, Gillard's former girlfriend, and Gillard's friends Michael and Vanessa Burden.

Defendant presented mitigation evidence tending to show that he had a difficult childhood. Defendant's father physically abused his children, sexually abused defendant's sisters, and physically abused defendant's mother. On one occasion defendant stood up to his father, who then shot him in the leg. Defendant's ex-girlfriend testified about how defendant was caring, how he took care of his brother and parents, and how he also helped her take care of her infant daughter. Defendant's nephew testified that defendant's mother burned trash and scraps in the yard of the residence. On rebuttal, Detective Sterling McClain testified that investigators had discovered

and examined a conventional burn pile separate and distinct from the two burn piles that smelled of blood and fuel.

Following closing arguments by counsel and the trial court's instructions to the jury, the jury deliberated and returned a binding recommendation that defendant be sentenced to death. As to both murders, the jury found that they were part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person. N.C.G.S. § 15A-2000(e)(11) (2007). One or more jurors found that defendant had no significant history of prior criminal activity, *id.* § 15A-2000(f)(1) (2007), along with several nonstatutory mitigating circumstances. The jury determined that the mitigating circumstances were insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial, when considered with the mitigating circumstances, to impose the death penalty. The trial court then entered judgment accordingly.

## ANALYSIS

### *The Reappointment of Attorney George Franks*

**[1]** Defendant's first argument is that the trial court erred in not removing George Franks as his counsel or, in the alternative, by not holding a hearing to determine whether there was a conflict of interest between defendant and Franks. We disagree.

Following defendant's arrest, Ray Colton Vallery was appointed by Indigent Defense Services (IDS) to represent defendant on 22 October 2001. Following a Rule 24 conference held on 16 September 2002, IDS appointed George Franks as second chair on 19 September 2002. On 23 September 2002, defendant filed a *pro se* motion requesting that Vallery be withdrawn as counsel, stating that Vallery had failed to communicate with defendant and had not been diligent in his investigation of the case. The trial court heard argument on the motion on 10 October 2002. After defendant was asked whether he wanted both Vallery and Franks to be removed, the following colloquy took place:

THE DEFENDANT: I barely know him.

MR. FRANKS: Your Honor, I prefer to be removed as well so if he has counsel, he can have a clean slate, Your Honor. I have worked with Mr. Vallery, known him for years. He is a good attorney.

**STATE v. WILLIAMS**

[363 N.C. 689 (2009)]

THE COURT: Yes, sir.

MR. FRANKS: If he's going to have trouble with Mr. Vallery, he's going to have trouble with me. I'm getting too old for trouble.

The trial court allowed defendant's motion and removed both attorneys, stating that IDS would need to make new appointments. IDS appointed Carl Ivarsson on 8 November 2002 and reappointed Franks as second chair on 19 December 2002.

Around the date of defendant's February 2003 arraignment, defendant wrote two letters, one to the clerk of court and the other addressed to Superior Court Judge Weeks. Defendant's 10 February 2003 letter to Judge Weeks stated:

My name is Eugene Johnny Williams and the reason why I'm writting you is we seem to have a problem. My O.C.A. File record is #2001-14056, and Mr. Williams is charged with two counts of First Degree Murder and in September 2002, Mr. Williams filed a motion for attorney to be withdrawn from his case. In October 2002 Mr. Williams was brought back in front of you and my motion was granted, but now it seems to have another issue, One of two lawyers, "Mr. Franks" was present at Mr. Williams court hearing on 02/02 And he said he was still one of my attorneys. But in October 2002, he stated in front of Mr. Weeks the Judge overlooking the case, and said, "He and protege Mr. Vallery, he wanted to step down from my case since Mr. Williams didn't want Mr. Vallery to represent him." But now he only said three words to me while I was in court a few days ago, and the other attorney, "Judge Weeks" Mr. Williams doesn't even know his name or nothing at all about him. The main reason why Mr. Williams is writting this letter is because this is my life that is on the line. Mr. Williams truly understand that a court-appointed attorney will only go by his guidelines on jailed clients. But at the same time my life is on the line, or another words in someone's elses' hands. But Judge Weeks I never received a copy of any judgement on your ruling for new attorneys, and I am writting to Bar association so Mr. Williams can receive a pair of attorneys that will truly represent Mr. Williams in his case. Mr. Williams will receive the fair shake of the judicial system if attorneys and clients don't work together. Then last but not less none of my attorneys keep in touch no matter that the case may be. . . . [sic]

Defendant's 18 February 2003 letter to the Clerk of Court read:

I Eugene Johnny Williams, hereby state and request the following. That on or about the 24, day of October 2002, the Honorable Judge Greg Weaks pursuant to GS15A-144, granted Mr. Williams request for removal of counsel. at said hearing Judge Weaks allowed Attorney Raymond Vallery to redraw as counsel for Mr. William, at which point Mr. Williams co counsel Mr. Franks, requested that he also be allowed to withdrawl, This Too was granted.

I hereby contend, that Judge Weaks at this time guranteed Mr. Williams new appiontment of counsel, whereby Mr. Franks was reinstated, as co-counsel aginst Mr. Williams request. Co-counsel along with Mr. Franks was never made knowne To Mr. Williams. It is hereby requested That due To The severity of the charges charged aginst Mr William, it is most important That he contact counsel appointed by This court, whereby Mr. William Respectfully request the name address and phone number, of counsel and co-counsel for Mr. Williams pursuant To File # OCA 2001-14056. Now before This court. [sic]

Judge Weeks wrote defendant, informing him that Ivarsson was appointed as first chair and Franks was reappointed as second chair. Judge Weeks indicated that he had spoken to Ivarsson and Franks and also was providing them a copy of the letter sent by defendant requesting that his attorneys "keep in touch" with him. Defendant asserts the trial court erred by not removing Franks once again or conducting a hearing on whether defendant was entitled to substitute counsel. We disagree.

Defendant argues that two legal principles compel us to rule in his favor. First, defendant argues that "once a Superior Court Judge has issued a ruling in a case, the ruling becomes the law of the case." Thus, defendant asserts that IDS's reappointment of Franks as second chair counsel violated Judge Weeks's order to have IDS appoint new counsel in the case. To the contrary, Judge Weeks's order consisted solely of the following: "All right. Motion is allowed." Judge Weeks simply allowed defendant's motion to have counsel removed from his case. After the order allowing the motion, Judge Weeks began to address who would be appointed to represent defendant, and Franks indicated that the decision would go to IDS. The trial court agreed and simply stated as fact to defendant that "[i]t goes back to IDS which means your case is going to be further delayed which means this case has to go back up to them and they have to

make new appointments." Judge Weeks's order allowing defendant's motion to remove counsel did not, implicitly or explicitly, order that Franks not be reappointed as counsel. Thus, we cannot agree that IDS violated the trial court's order.

**[2]** Second, defendant argues that "when faced with a request for substitute counsel, a trial court has an obligation to conduct a sufficient inquiry to determine if the defendant is entitled to the appointment of substitute counsel." Defendant relies on *State v. Thacker*, 301 N.C. 348, 271 S.E.2d 252 (1980), for this proposition. In *Thacker* this Court stated: "[W]hen faced with a claim of conflict *and a request for appointment of substitute counsel*, the trial court must satisfy itself only that present counsel is able to render competent assistance and that the nature or degree of the conflict is not such as to render that assistance ineffective." *Id.* at 353, 271 S.E.2d at 256 (emphasis added). We do not agree with defendant that his letter to the trial court "clearly constitutes a request for substitute counsel." Instead, defendant's letter indicates uncertainty on his part regarding why Franks was still his attorney. Had defendant wished to have Franks removed as counsel, defendant could have filed another motion to have his attorney replaced. Defendant obviously possessed the ability to do so, as evidenced by his prior *pro se* motion that was allowed by Judge Weeks. Thus, in the absence of a request for the appointment of substitute counsel, the trial court was not required to hold any hearing.

Even if we were to conclude that a hearing should have been held, we are not persuaded that any alleged conflict of interest would have been sufficient to remove Franks from the case. The issue would have been whether Franks was "able to render competent assistance and that the nature or degree of the conflict is not such as to render that assistance ineffective." *Id.* Defendant was not entitled to counsel of his choice, 301 N.C. at 351-53, 271 S.E.2d at 255, nor was he constitutionally entitled to second chair counsel, *State v. Locklear*, 322 N.C. 349, 357, 368 S.E.2d 377, 382 (1988) (explaining that the right to the "appointment of *additional* counsel in capital cases is statutory, not constitutional"). Even had defendant been constitutionally entitled to a second attorney, there is no indication that any conflict with Franks would rise to the level of rendering Franks's "assistance ineffective." Defendant never asked for Franks to be removed, but rather, Franks was initially removed on his own request. Defendant did not make any formal motion or inform the trial court in any way that he had a potential conflict of interest with

Franks. We do not agree with defendant that any potential conflict that existed between defendant and Franks would have been apparent to the trial court, such as to compel the trial court to *ex mero motu* conduct a hearing on the matter. We also disagree with defendant's alternative argument that he is entitled to present his concerns to the trial court on remand to establish his allegations if this Court finds that a new trial is not warranted. Accordingly, defendant's assignments of error are overruled.

### Defendant's Pro Se *Speedy Trial Motion*

[3] Defendant next argues that the trial court erred by "summarily denying" his *pro se* motion to dismiss on speedy trial grounds. We disagree. Defendant was represented by appointed counsel and was not allowed to file *pro se* motions on his behalf. "A defendant has only two choices—'to appear *in propria persona* or, in the alternative, by counsel. There is no right to appear both *in propria persona* and by counsel.' " *State v. Thomas*, 331 N.C. 671, 677, 417 S.E.2d 473, 477 (1992) (citations omitted) (quoting *State v. Parton*, 303 N.C. 55, 61, 277 S.E.2d 410, 415 (1981), *disavowed on other grounds by State v. Freeman*, 314 N.C. 432, 437-38, 333 S.E.2d 743, 746-47 (1985)). "Having elected for representation by appointed defense counsel, defendant cannot also file motions on his own behalf or attempt to represent himself. Defendant has no right to appear both by himself and by counsel." *State v. Grooms*, 353 N.C. 50, 61, 540 S.E.2d 713, 721 (2000) (citations omitted), *cert. denied*, 534 U.S. 838 (2001).

Defendant asserts that these cases do not apply to his *pro se* motion to dismiss on speedy trial grounds because defense counsel "adopted" these motions. We disagree. Before the trial court considered the motion at issue, defense counsel stated: "The defendant filed some *pro se* motions. We need rulings on those." The trial court informed defendant that he had no right to file motions on his own behalf and that he could not continue to file *pro se* motions while being represented by counsel. The trial court then declined to rule on the *pro se* motions. Defendant argues that the trial court erred in not ruling on his *pro se* motions because the trial court erroneously believed that counsel had filed motions covering the issues raised by defendant in his *pro se* motions. That the trial court might have been mistaken as to whether defense counsel had filed similar motions is inapposite. Defendant was not entitled to file *pro se* motions while represented by counsel, and the statement to the trial court by defense counsel that the *pro se* motions needed to be ruled on hardly represents counsel's adoption of defendant's motion. Accordingly, the

**STATE v. WILLIAMS**

[363 N.C. 689 (2009)]

trial court did not err in refusing to rule on defendant's *pro se* speedy trial motion. Defendant's assignments of error are overruled.

### Defendant's Pro Se *Motion to Suppress*

Likewise, defendant argues that the trial court erred in "summarily denying" his *pro se* motion to suppress. This motion was addressed by the trial court during the same discussion that related to defendant's *pro se* motion to dismiss on speedy trial grounds. For the reasons previously stated, defendant was not entitled to a ruling from the trial court on a *pro se* motion filed while he was represented by appointed counsel. Thus, the trial court did not err in refusing to rule on defendant's *pro se* motion to suppress. Accordingly, defendant's assignment of error is overruled.

### The Testimony of Lieutenant Ray Wood

[4] Defendant asserts that the trial court erred in admitting some of the testimony of Lieutenant Ray Wood of the Cumberland County Sheriff's Office. Defendant argues that the testimony was "inadmissible lay opinion testimony" received in violation of his right to due process and a fair trial. Defendant's objections at trial were not based on constitutional grounds, and as a consequence, these claims are not reviewable on appeal and defendant does not contend plain error. *See* N.C. R. App. P. 10(b); *id.* 10(c)(4); *see also State v. Raines*, 362 N.C. 1, 16, 653 S.E.2d 126, 136 (2007), *cert. denied*, —— U.S. ——, 129 S. Ct. 2857 (2009). While we decline to review defendant's constitutional arguments, we will address his assertion that the testimony was inadmissible lay opinion testimony.

Rule 701 of the North Carolina Rules of Evidence states:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2007). The State never tendered Wood as an expert witness, but informed the trial court that it would offer his testimony regarding his personal observations and as a lay opinion consistent with Rule 701. We review the trial court's decision to admit evidence for abuse of discretion, looking to whether "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323

N.C. 279, 285, 372 S.E.2d 523, 527 (1988) (citation omitted). "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *State v. Lasiter*, 361 N.C. 299, 302, 643 S.E.2d 909, 911 (2007) (citing *Wainwright v. Witt*, 469 U.S. 412, 434 (1985)). We conclude that the trial court did not abuse its discretion in any of the five instances about which defendant complains, as the testimony was either not opinion testimony or was admissible as a lay opinion.

First, defendant asserts the trial court erred in overruling his objection to Wood's testimony that the "white crystal powdery-type substance" found on the vehicle in which the victims were discovered "looked like as far as the size and how it was distributed over the vehicle, is taking your car into a car wash and the car wash mechanism spraying the suds . . . and the car not being rinsed. That's what it looked like." Here, Wood was not offering his opinion that defendant attempted to wash the vehicle without rinsing it, but was explaining his observations about the size and distribution of the spots found on the vehicle. Thus, this testimony was not opinion testimony.

Second, defendant argues the trial court erred in permitting Wood to testify that it was his opinion that the victims were not shot in the vehicle in which their bodies were found. This opinion was based upon Wood's observations that there was no pooling of blood in or around the vehicle, no shell casings found in the car or around the car, very little blood spatter in the vehicle, and no holes or projectiles found in the vehicle or outside the vehicle. Thus, Wood's opinion was rationally based on his perception. Additionally, the location of the murders was a key issue linking defendant to the crime. Wood's opinion whether the victims were murdered in the location where the vehicle was found or were killed inside the vehicle was helpful to the determination of a fact of the case and was thus admissible under Rule 701. The trial court did not abuse its discretion in overruling defendant's objection.

Third, defendant objected to Wood's testimony that it was his opinion that Leavy had been "winched in" the vehicle by the use of the rope found inside the vehicle. Wood's testimony was based upon his perception of blood patterns, the location of the vehicle, and the positioning of and tension on the rope on the seat and Leavy's hands. Moreover, his opinion was helpful in determining how defendant, acting alone, would have been able to move Leavy's large body from defendant's residence to the vehicle. Accordingly, the testimony was

admissible lay opinion testimony, and the trial court did not abuse its discretion in admitting it.

Fourth, defendant argues that the trial court erred in allowing Wood to testify that a blanket seized from defendant's home was the "same type blanket" as that covering one of the decedents. Defendant did not object to this testimony at trial and has not argued in his brief that admission of this evidence amounts to plain error. Accordingly, we will not review this contention. *See* N.C. R. App. P. 10(c)(4).

Finally, defendant argues the trial court erred in allowing Wood to testify that it was his opinion that the victims were dragged through the grass at defendant's residence. This testimony was based upon Wood's observations at defendant's residence and his experience in luminol testing. Additionally, this testimony was helpful to the determination of how the victims' bodies may have been moved from defendant's residence into the vehicle and ultimately to the place where they were discovered. The testimony was admissible. Defendant's assignments of error are overruled.

*Pretrial Statements of Sharon Cogdell and Jimmy Locklear*

[5] Defendant argues the trial court erred in admitting the pre-trial statements of Sharon Cogdell and Jimmy Locklear for the purpose of corroborating their testimony. Although defendant raises this as a constitutional issue on appeal, he did not object on constitutional grounds at trial and does not contend plain error; accordingly, we will not review these assignments of error on constitutional grounds. *See id.* 10(b); *id.* 10(c)(4); *see also Raines*, 362 N.C. at 16, 653 S.E.2d at 136. We will review defendant's assignments of error only for alleged violations of the North Carolina Rules of Evidence, and we conclude that the trial court did not abuse its discretion in admitting the statements for corroborative purposes.

" 'Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness.' " *State v. Harrison*, 328 N.C. 678, 681, 403 S.E.2d 301, 303 (1991) (quoting *State v. Rogers*, 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980)). "Deciding whether to receive or exclude corroborative testimony, so as to keep its scope and volume within reasonable bounds, is necessarily a matter which rests in large measure in the discretion of the trial court." *State v. Garcell*, 363 N.C. 10, 39-40, 678 S.E.2d 618, 637 (citations and internal quotation marks omitted), *cert. denied*, —— U.S. ——, 78 U.S.L.W. 3252 (2009). Indeed,

STATE v. WILLIAMS

[363 N.C. 689 (2009)]

> prior statements of a witness can be admitted as corroborative evidence if they tend to add weight or credibility to the witness' trial testimony. New information contained within the witness' prior statement, but not referred to in his trial testimony, may also be admitted as corroborative evidence if it tends to add weight or credibility to that testimony.

*State v. Davis*, 349 N.C. 1, 28, 506 S.E.2d 455, 469-70 (1998) (citations and internal quotation marks omitted), *cert. denied*, 526 U.S. 1161 (1999). "[I]f the testimony offered in corroboration is generally consistent with the witness's testimony, slight variations will not render it inadmissible. Such variations affect only the credibility of the evidence which is always for the jury." *State v. Warren*, 289 N.C. 551, 557, 223 S.E.2d 317, 321 (1976) (citations omitted). When determining whether the trial court abused its discretion, we look to whether "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Hennis*, 323 N.C. at 285, 372 S.E.2d at 527. "In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *Lasiter*, 361 N.C. at 302, 643 S.E.2d at 911.

Defendant asserts that the trial court erred when Detective Robert Gilford of the Cumberland County Sheriff's Office was allowed to testify that Sharon Cogdell told him that Leavy had received a telephone call from Gillard on 9 October 2001 and that Gillard asked Leavy to go somewhere with him. While Cogdell did not testify at trial that Leavy had received a telephone call from Gillard, she did testify that Leavy received a telephone call at her residence, that about fifteen minutes later a car came to her residence and Leavy left in the car, and that she called Gillard a short while later, asking to talk to Leavy, and was told they would return her call. The trial court instructed the jury to disregard Detective Gilford's testimony insofar as it did not corroborate Cogdell's testimony. Gilford's testimony generally tracked Cogdell's testimony and was not contrary to or inconsistent with it. We cannot say that the trial court's decision to allow the testimony was manifestly unsupported by reason.

Defendant also argues the trial court erred when Detective Charles Disponzio of the Cumberland County Sheriff's Office gave corroboration testimony detailing a statement allegedly made by defendant to his cellmate Jimmy Locklear before the murders. At trial, Locklear testified that defendant was upset with an unidentified person because that person owed him money and was "ducking"

him. Defendant told Locklear that he was going to "f\*\*\* him up." Locklear also testified that the unidentified man had only paid a portion of the sales price and that he still owed defendant $1500 to $2000. Locklear testified that defendant was involved in the stealing and selling of motorcycles and that defendant had mentioned a "nine millimeter" at one time. Detective Disponzio's testimony regarding Locklear's statement was that defendant said about the man who owed him money that "[h]e was going to kill him and f\*\*\* him—or f\*\*\* him up, in other words." While Locklear testified that defendant did not use the word "kill," we note that Detective Disponzio made only a fleeting mention of the word, which could certainly be a reasonable interpretation of "f\*\*\* him up." Any prejudicial effect of the admission of this portion of the detective's testimony is mitigated by Gillis's testimony that defendant "said he was going to kill" Gillard upon defendant's release from the detention center. Additionally, the trial court properly instructed the jury on the corroborative purposes of Disponzio's testimony. Defendant also argues the trial court erred in allowing Disponzio to testify that the unnamed person with whom defendant was angry had given him the "runaround," that defendant recruited Locklear to help him "boost" motorcycles, and that defendant had "talked a lot about nine millimeters and a Glock and stuff and all that—Rugers, nine millimeters." Detective Disponzio's testimony generally tracked the testimony given by Locklear and was not in any way inconsistent with Locklear's testimony. We cannot say the trial court's decision to allow the testimony exceeded the bounds of reason. Accordingly, defendant's assignments of error are overruled.

### Sufficiency of the Evidence

**[6]** Defendant argues that the evidence presented was insufficient to permit a reasonable juror to find defendant guilty of the murders beyond a reasonable doubt. Additionally, because the evidence of guilt was allegedly insufficient, defendant contends the evidence was insufficient for the jury to find the aggravating circumstance as to each murder, namely, that defendant engaged in a course of conduct which included the commission of another crime of violence; here, the first-degree murder of another person. We disagree.

"When considering a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Morgan*, 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004) (citations omitted), *cert. denied*, 546 U.S. 830 (2005). "If substantial evidence exists to support each essential element of the crime charged and that defendant was the

perpetrator, it is proper for the trial court to deny the motion." *Id.* (citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Miller*, 363 N.C. 96, 99, 678 S.E.2d 592, 594 (2009) (citations and internal quotation marks omitted).

The State's evidence was sufficient. Witnesses testified that defendant bragged while in jail that he was going to "f*** him [Gillard] up" for not paying money owed, money that would have allowed defendant to be released from the detention center. In the days following defendant's release, he attempted to make telephone contact with Gillard at least eight times, leaving a message on Gillard's voice mail inviting him to see a motorcycle and ordering him to come alone. Shortly before his death, Gillard told others that he was going to purchase a motorcycle. On 9 October 2001, Gillard and Leavy left Leavy's residence together, and Leavy's girlfriend later called Gillard's mobile phone and was told that they were busy and would return her call later. This call was routed through the southwest panel of the cellular phone tower nearest defendant's residence. Moreover, certain evidence indicated that the murders did not occur in the vehicle containing the bodies or in the area where the vehicle was found. In defendant's yard there were two areas of roughly twenty to thirty square feet each where fresh soil was spread over the grass. Under the soil, the ground smelled of gasoline and putrid blood. During the 2007 sentencing hearing, evidence was presented that a part of the soil tested positive for blood. A piece of concrete found several inches in the ground tested positive for human blood. Two spent nine millimeter projectiles were found in the ground at defendant's residence, along with spent nine millimeter casings. The projectiles recovered from the victims' bodies and from defendant's yard were fired from a weapon with a left-hand twist and nine lands and grooves. Approximately one week after the murders, defendant asked a friend to pawn a gold ring with a black onyx stone. The ring was similar to one owned by Gillard and purchased by him several months earlier from the same pawnshop.

Defendant basically attempts to interpret the evidence in a light most favorable to him, detailing other plausible explanations for the evidence presented by the State at trial. "However, '[w]hen ruling on a motion to dismiss for insufficient evidence . . . . [a]ny contradictions or conflicts in the evidence are resolved in favor of the State and evidence unfavorable to the State is not considered.'" *State v. Wilkerson*, 363 N.C. 382, 427-28, 683 S.E.2d 174, 202 (2009) (quoting

*Miller*, 363 N.C. at 98, 678 S.E.2d at 594 (alterations in original) (citations omitted by court)). These assignments of error are overruled.

### *Jurisdictional Issues*

**[7]** Following the guilt phase of defendant's trial in 2004, counsel for defendant, Ivarsson and Franks, met with him in a classroom at the Cumberland County Detention Center. Defendant immediately became aggressive, shouting at counsel, cursing at them, and hurling racially-charged vulgar epithets at them. Defendant then slammed his fists on a table, threw the table at Franks, and then pushed the table on Franks, knocking him to the ground. Employees of the detention center heard the commotion and entered the room. They immediately stood between defendant and his counsel and asked counsel to leave. Counsel then filed a motion to withdraw, which the trial court granted. Judge Weeks declared a mistrial as to the penalty proceeding and dismissed the jury. In 2007 Judge Lock presided over defendant's penalty proceeding, and a new jury was empaneled. Defendant argues the trial court lacked jurisdiction to enter a sentence of death against him because (1) Judge Lock did not preside over the guilt phase of defendant's trial; (2) the jury that recommended a sentence of death was not the same jury that returned the guilty verdicts in the guilt phase; and (3) the sentencing judgment was entered out-of-session and out-of-term.

We disagree with defendant that the trial court lacked jurisdiction to enter a judgment sentencing him to death. Defendant has taken issues of procedure and attempted to recast them as jurisdictional issues. While N.C.G.S. § 15A-2000(a), which governs penalty proceedings after a finding of guilt in capital cases, does envision the same trial judge presiding over a defendant's guilt phase and penalty proceeding, the statute also envisions the proceeding being held immediately or soon after the defendant has been found guilty of a capital offense. Such a scenario was impossible in this case because of defendant's unprovoked attack on one of his attorneys. No binding statute or case law prohibits a superior court judge other than the one who presided over the guilt phase from presiding over the penalty proceeding.[1] Defendant's reading of N.C.G.S. § 15A-2003 is

---

1. Defendant argues that *Harris v. Lee*, No. 91-CRS-16272 (Super. Ct. Onslow County Oct. 22, 2001) (unpublished order), *cert. denied*, 559 S.E.2d 802 (N.C. 2002) is persuasive in this case. We do not find defendant's analogies to this case to be compelling. We also note that we are not bound by decisions of a superior court and that this Court's denial of certiorari has no precedential value. *Jenkins v. Aetna Cas. & Sur. Co.*, 324 N.C. 394, 400, 378 S.E.2d 773, 777 (1989).

unduly narrow, and that statute is not applicable in this case. The superior court's jurisdiction over the subject matter of this case was established when defendant was indicted for a felony, and jurisdiction over the penalty phase was established when defendant was convicted of a capital offense. *See* N.C.G.S. § 7A-271 (2007). The trial court was not divested of its subject matter jurisdiction because Judge Lock, instead of Judge Weeks, presided over the penalty proceeding.

[8] Moreover, we reject defendant's argument that the sentencing jury lacked jurisdiction to recommend a sentence of death. We note again that N.C.G.S. § 15A-2000(a)(2) sets out procedure, not jurisdiction. Moreover, section 15A-2000(a)(2) addresses occasions when the guilt phase jury is unable to sit for the penalty phase. Defendant argues there was no indication that the guilt phase jury would have been unable to reconvene three years later to sit for his penalty proceeding. The likelihood of all jurors who served on the guilt phase jury to be available and qualified to serve three years later is a practical impossibility. In order for the trial jury to sit as the sentencing jury, no juror could have moved outside the district during the three-year gap between defendant's conviction and the penalty proceeding. The jurors would have been expected to not speak to others, for a period of three years about a high-profile double murder case on which they had served. Moreover, the jurors also would have been expected to shield themselves from all media reports on the case. We cannot say that it was an abuse of discretion for Judge Weeks to declare a mistrial or for Judge Lock to convene a new jury.

[9] Finally, we do not agree with defendant that the trial court lacked jurisdiction because the judgments were entered out-of-term and out-of-session. The principles articulated by this Court in *State v. Boone*, 310 N.C. 284, 311 S.E.2d 552 (1984) and *State v. Trent*, 359 N.C. 583, 614 S.E.2d 498 (2005) are simply not relevant in this case. In *Boone* and *Trent*, both orders at issue pertained to suppression motions on which the trial court did not rule until after the session ended and the terms at which the motions were heard had expired. In this case, a mistrial was declared because of defendant's physical attack on his appointed counsel. Following this assault, both attorneys were allowed to withdraw, and new counsel needed to be appointed. The time required for defendant's new counsel to become prepared to defend him necessitated the delay in beginning the penalty proceeding. Even had some procedural error been committed, defendant would not have been prejudiced by it. "A defendant is

not prejudiced . . . . by error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (2007). Accordingly, we overrule defendant's assignments of error.

### Jury Pool Selection Outside Defendant's Presence

[10] Defendant argues that the trial court violated his right under Article I, Section 23 of the North Carolina Constitution to be present at all proceedings of his capital trial when the deputy clerk selected forty-eight prospective jurors from the pool in the jury assembly room, outside defendant's presence. A defendant's right to be present at all proceedings of his capital trial under Article I, Section 23 is unwaivable. *State v. Boyd*, 332 N.C. 101, 105, 418 S.E.2d 471, 473 (1992) (citations omitted). Thus, even though defendant did not object—and actually consented to the actions of the jury clerk—we will still consider his argument.

When defendant's 2007 penalty proceeding began, the trial court informed the parties that it appeared a civil trial would be occurring concurrently in another courtroom. Approximately eighty prospective jurors had reported for duty and were being held in the jury assembly room. The trial court proposed that forty-eight jurors be selected by the jury clerk for possible service in this case. There was no objection to this plan of action. Following some discussion on administrative matters, the trial court informed the parties that the clerk had anticipated "what we were going to do, based upon my comments a moment ago" and had "already communicated that to the courtroom—excuse me, to the jury clerk who is working with the venire, and she has already drawn out 48 people and will call those names." A few days later, as the jury was still being selected, the trial court informed the parties: "Friday afternoon, I discussed with . . . the Trial Court Administrator, the process of selecting additional jurors for this week. And tentatively decided that the best thing to do would be to select a number of jurors from the venire first thing this morning and have just those jurors fill out questionnaires since they certainly need other jurors for other matters going on here in the courtroom or the courthouse this week." There was no objection by either party to the jury clerk's selecting thirty prospective jurors at random in this manner.

Defendant asserts that he had a constitutional right to be present when the prospective jurors were being chosen. Jurors are selected in the courtroom pursuant to section 15A-1214(a), which provides in pertinent part: "The clerk, under the supervision of the presiding

judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." N.C.G.S. § 154-1214(a) (2007). The purpose of random selection in the courtroom is to ensure that neither party knows the identity of the next prospective juror to be questioned.

To the extent defendant is challenging the initial organization of the entire venire into separate panels that were later sent sequentially to the courtroom, such a process was a purely administrative matter and not a "proceeding" at which defendant is entitled to be present. We find *State v. Workman*, 344 N.C. 482, 476 S.E.2d 301 (1996), instructive even though defendant's case had been called for trial. In *Workman* this Court stated: "Defendant's right to be present at all stages of his trial does not include the right to be present during preliminary handling of the jury venires before defendant's own case has been called." *Id.* at 498, 476 S.E.2d at 309 (citations omitted). Likewise, in the instant case, the random segregation of the entire jury pool so that it could be split among defendant's proceeding and other matters being handled at the courthouse that day was a preliminary administrative matter at which defendant did not have a right to be present. *See State v. McNeill*, 349 N.C. 634, 642-43, 509 S.E.2d 415, 420 (1998) (stating that defendant did not have the right to be present when prospective jurors were sworn in by a deputy clerk in the jury assembly room and the jurors "were subject to assignment in any one of six superior courts in session as well as any number of district courts"), *cert. denied*, 528 U.S. 838 (1999). Moreover, to march a defendant who had been shackled because of a physical assault of his attorney and who had been recently convicted of two counts of first-degree murder through the courtroom halls into a jury room in order for him to be present during the random drawing of names of prospective jurors is impractical and most likely an administrative impossibility. Because defendant's right to be present at all proceedings does not extend to the jury assembly room, we disagree with defendant's contention that his right to be present was violated. Defendant's assignment of error is overruled.

*Admission of Evidence from Guilt Phase at Penalty Proceeding*

**[11]** Defendant argues the trial court erred in admitting during the penalty proceeding evidence that defendant, following the murders, possessed items that belonged to the victims. Defendant contends admission of this evidence was erroneous because he was acquitted of robbery of the victims. We disagree.

**STATE v. WILLIAMS**

[363 N.C. 689 (2009)]

Although defendant did file a motion *in limine* to exclude evidence that defendant possessed Gillard's ring and watch and Leavy's ring, defendant did not object when the evidence was admitted. While we generally would not review defendant's claims on the merits, we elect to do so under Rule 2 of the North Carolina Rules of Appellate Procedure. Defendant's argument is that *State v. Scott*, 331 N.C. 39, 413 S.E.2d 787 (1992), controls here rather than *State v. Agee*, 326 N.C. 542, 391 S.E.2d 171 (1990). We disagree and find *Agee* to be on point.

While the North Carolina Rules of Evidence that controlled in *Agee* and *Scott* are not binding in a capital penalty proceeding, they do provide this Court guidance. *See State v. Duke*, 360 N.C. 110, 124, 623 S.E.2d 11, 21 (2005) (citation omitted), *cert. denied*, 549 U.S. 855 (2006). In *Scott* this Court concluded that evidence of a prior rape of which the defendant had been acquitted was inadmissible as a matter of law in a subsequent case in which the defendant was charged with the rape of another woman. 331 N.C. at 42, 413 S.E.2d at 788. In *Agee* this Court held that evidence that the defendant possessed marijuana, a charge of which the defendant had been acquitted, was admissible against the defendant in a subsequent case involving the same transaction in which the defendant was charged with possession of LSD. 326 N.C. at 546-50, 391 S.E.2d at 173-76. In distinguishing *Agee*, the Court in *Scott* wrote: "The 'chain of circumstances' link that arguably made [the marijuana] evidence probative in *Agee* by virtue of its temporal relevance to the crime for which the defendant was on trial is absent here." 331 N.C. at 46, 413 S.E.2d at 790-91.

As in *Agee*, the evidence presented during the penalty proceeding here was not offered to prove that defendant had robbed his victims. Instead, the State used the evidence to prove its single aggravating factor for each murder—that defendant had engaged in a course of conduct that involved a crime of violence against another person or persons, namely the murder of another. Defendant's possession of the victims' items in and of itself would not be sufficient to prove robbery beyond a reasonable doubt. However, evidence that defendant possessed these items was relevant to linking defendant to both victims. Moreover, as in *Agee*, defendant's possession of the items was temporally relevant to the chain of circumstances surrounding defendant's crimes. The trial court did not err in admitting the evidence. *See* N.C.G.S. § 15A-2000(a)(3) (2007) (stating, *inter alia*, that in the penalty proceeding, "[a]ny evidence which the court deems to have probative value may be received"). Defendant's assignments of error are overruled.

## PRESERVATION ISSUES

Defendant raises as preservation issues (1) that the trial court erred by denying his motion for a bill of particulars detailing the State's theory of the case; (2) that the short-form indictment used was insufficient to charge first-degree murder; (3) that the trial court erred in denying defendant's motions to strike the death penalty from consideration because the death penalty is cruel and unusual punishment and is administered in an arbitrary and capricious manner; and (4) that the trial court erred in refusing to give his requested jury instruction on mitigating circumstances. We have rejected these arguments in the past, and decline to revisit them today. *See State v. Elliott,* 360 N.C. 400, 421-24, 628 S.E.2d 735, 749, *cert. denied,* 549 U.S. 1000 (2006); *State v. Garcia,* 358 N.C. 382, 387-90, 423-25, 597 S.E.2d 724, 731-33, 752-53 (2004), *cert. denied,* 543 U.S. 1156 (2005); *State v. Conaway,* 339 N.C. 487, 532-34, 536, 453 S.E.2d 824, 852-55, *cert. denied,* 516 U.S. 884 (1995).

## PROPORTIONALITY

[12] Because we have concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we now consider: (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentences were entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentences are excessive or disproportionate to the penalty imposed in similar cases, considering both the facts of the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (2007).

The jury found only one aggravating circumstance in each murder, the section 15A-2000(e)(11) aggravating circumstance that the murder was part of a course of conduct in which defendant engaged and that course of conduct included the commission by defendant of other crimes of violence against another person. We have previously noted that sufficient evidence was presented that defendant murdered both Gillard and Leavy. Accordingly, we find that the evidence supports the aggravating circumstances found by the jury. Additionally, nothing in the record indicates that the sentences were imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we determine whether defendant's sentences were proportional, considering both the crime and defendant.[2] In determining proportionality, we consider "all cases which are roughly similar in facts to the instant case, although we are not constrained to cite each and every case we have used for comparison." *State v. McNeill*, 360 N.C. 231, 254, 624 S.E.2d 329, 344 (citing *State v. Al-Bayyinah*, 359 N.C. 741, 760-61, 616 S.E.2d 500, 514 (2005), *cert. denied*, 547 U.S. 1076 (2006)), *cert. denied*, 549 U.S. 960 (2006). "Although we 'compare this case with the cases in which we have found the death penalty to be proportionate . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *Garcia*, 358 N.C. at 429, 597 S.E.2d at 756 (quoting *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254 (1994) (alteration in original)). "[O]nly in the most clear and extraordinary situations may we properly declare a sentence of death which has been recommended by the jury and ordered by the trial court to be disproportionate." *State v. Chandler*, 342 N.C. 742, 764, 467 S.E.2d 636, 648 (citation omitted), *cert. denied*, 519 U.S. 875 (1996). The determination of proportionality of an individual defendant's sentence is ultimately dependent upon the sound judgment and experience of the members of this Court. *See McNeill*, 360 N.C. at 253, 624 S.E.2d at 344 (citing *Garcia*, 358 N.C. at 426, 597 S.E.2d at 754).

There have been eight cases in which this Court has determined that a defendant's sentence was disproportionate: *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

In all these cases, there was a single victim, but here, defendant murdered two people. "[W]e have never found a death sentence disproportionate in a double-murder case." *State v. Sidden*, 347 N.C. 218, 235, 491 S.E.2d 225, 234 (1997) (citing *State v. Conner*, 345 N.C. 319, 338, 480 S.E.2d 626, 635, *cert. denied*, 522 U.S. 876 (1997)), *cert.*

---

2. Defendant argues that the proportionality review as set out by statute and this Court is unconstitutional. We reviewed and rejected these arguments in *Garcia*, and decline to revisit them here. 358 N.C. at 429, 597 S.E.2d at 756.

*denied*, 523 U.S. 1097 (1998). We decline to do so here. In terms of the aggravating circumstances found, this case is very similar to *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056 (1982), in which this Court found the defendant's sentence to be proportionate when the only aggravating circumstance found was the (e)(11) aggravator. *Id.* at 684, 690, 292 S.E.2d at 260, 263.

In this case, the facts are more similar to those cases in which a defendant has needlessly taken the lives of two human beings, as opposed to one. We found the death penalty not disproportionate in *State v. Raines*, 362 N.C. at 26, 653 S.E.2d at 142, in which the defendant killed a husband and wife, *id.* at 7, 653 S.E.2d at 130. Likewise, in *Duke*, 360 N.C. at 144, 623 S.E.2d at 33, we noted how the defendant's murder of two men was significant in a finding of proportionality. *See also Sidden*, 347 N.C. at 235, 491 S.E.2d at 234; *Conner*, 345 N.C. at 338, 480 S.E.2d at 635.

The evidence here indicated that defendant lured his victims to his residence by telling Gillard that he had another motorcycle for him. Defendant instructed Gillard to come alone. Defendant had been angry with Gillard for failing to pay him in full for his last motorcycle deal and had made threats against Gillard while in jail. Defendant's killing of Gillard appeared to be motivated by revenge for Gillard's failure to pay, which prevented defendant from being able to make bail during his incarceration. Moreover, defendant was convicted of both murders on the basis of premeditation and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Watts*, 357 N.C. 366, 380, 584 S.E.2d 740, 750 (2003) (citations and internal quotation marks omitted), *cert. denied*, 541 U.S. 944 (2004). We can conclude that defendant's sentences are proportionate.

## CONCLUSION

Defendant has made other assignments of error, but has not provided any argument or supporting authority for these assignments in his brief. Consequently, we consider those assignments of error abandoned, and they are dismissed. *See* N.C. R. App. P. 28(b)(6); *Raines*, 362 N.C. at 26, 653 S.E.2d at 142 (citation omitted).

We conclude defendant received a fair trial and sentencing proceeding, and we find no error in his convictions or sentences. Moreover, we conclude that defendant's sentences of death are not disproportionate and should remain undisturbed.

NO ERROR.

Justice TIMMONS-GOODSON took no part in the consideration or decision of this case.