IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-910

No. COA22-243

Filed 29 December 2022

Nash County, Nos. 17CRS054450-51

STATE OF NORTH CAROLINA

v.

DAMIAN R. TAYLOR, Defendant.

Appeal by Defendant from judgments entered 22 April 2021 by Judge Quentin T. Sumner in Nash County Superior Court. Heard in the Court of Appeals 18 October 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Taylor H. Crabtree, for the State.*

*Joseph P. Lattimore for Defendant-Appellant.*

INMAN, Judge.

Defendant Damian R. Taylor appeals from judgments entered after a jury found him guilty on two counts of discharging a weapon into an occupied property inflicting serious injury and one count of possession of a firearm by a felon. On appeal, Defendant contends that the trial court erred in: (1) allowing several police officers to offer their lay opinion that Defendant can be identified as the shooter in surveillance video of the crime; (2) denying Defendant's motion to dismiss the charges

of discharging a firearm into an occupied property inflicting serious injury; and (3) admitting testimony from police that Defendant was not cooperative in the investigation. After careful review, we hold Defendant has failed to demonstrate error.

## I.   FACTUAL AND PROCEDURAL HISTORY

The evidence of record tends to show the following:

In the late-night hours of 3 November 2017, Crystal Tyree was in her living room in Rocky Mount when several gunshots were fired into her home from her front yard. Ms. Tyree suffered numerous injuries from the gunfire, including a broken leg and a headwound. Several officers with the Rocky Mount Police Department promptly arrived at Ms. Tyree's home to investigate and render aid to Ms. Tyree.

The investigating officers located the following evidence at the crime scene: (1) six stamped .40 caliber shell casings in the front yard; (2) bullet holes in the living room wall above a couch; (3) a projectile behind Ms. Tyree's television; (4) a shattered glass coffee table on Ms. Tyree's porch; (5) bullet holes in the front door; (6) a .40 caliber stamped shell casing in the road in front of the home; and (7) a blood trail left by Ms. Tyree as she dragged herself from the living room to the kitchen.

Ms. Tyree gave police surveillance footage from three security cameras placed around her home. The video, in black and white, shows a Dodge Avenger stop outside Ms. Tyree's home. A driver exits the vehicle, approaches the home, and then moves

closer toward the home and out of the camera frame. Debris then flies from the home. Another individual then gets out of the passenger side of the Avenger and points a gun at the home, though it does not appear to fire. No muzzle flash is shown on the video, and the person seemingly manipulates the gun's firing mechanism after attempting to fire two shots. The driver then reenters the frame and a flash can be seen after he returns to the car. The video next shows a flash from the driver's side of the vehicle as it pulls away from Ms. Tyree's home.

¶ 6        One of the responding officers who viewed the video, Sergeant Keith Miller, believed he recognized Defendant as the driver and another man, Jerry Green, as the passenger. Sgt. Miller had seen Defendant before and was able to specifically identify him as the driver based on his thick glasses, dreadlocks, and slight size.

¶ 7        Independent of Sgt. Miller's video identification, another officer, Officer Daryl Jones, linked Defendant and Jerry Green to the crime as potential suspects. Told only to be on the lookout for a "dark-in-color sedan," Officer Jones drove to a home on Proctor Street where he had observed a dark Dodge Avenger a few days earlier. When he arrived, Officer Jones found the car parked in a driveway with two men inside. Officer Jones then drove around the block while waiting for other officers to arrive; when he next approached the home, Defendant, Jerry Green, and Terry Green— Jerry's brother—were standing beside the Dodge Avenger and a green Toyota Camry parked nearby. A detective spoke with the three men about the shooting, and all

three denied any involvement. Police departed without further investigation at that time.

¶ 8        Later that evening, the identification of Defendant and Jerry Green on the video renewed police interest in the two men's potential involvement in the crime. Officers returned to Proctor Street but were unable to locate Defendant or the Greens; a short time later, however, police detained Terry Green in the green Toyota Camry during a traffic stop. Jerry Green arrived on the scene while the stop was underway and was arrested. Moments later, Defendant drove up in the dark-colored Dodge Avenger seen on the surveillance video; he was then arrested by Sgt. Miller. Police searched Defendant's car and found seven 9 mm shell casings in the vehicle.

¶ 9        Defendant was subsequently indicted on: (1) one count of assault with a deadly weapon with intent to kill inflicting serious injury; (2) two counts of discharging a weapon into occupied property inflicting serious bodily injury; and (3) one count of possession of a firearm by a felon. Prior to trial, Defendant moved to suppress any witness identification of him as the driver seen in the surveillance video. The trial court held a pre-trial *voir dire* hearing on 19 April 2021 before denying Defendant's motion. The State also dismissed the charge of assault with a deadly weapon with a deadly weapon with intent to kill inflicting serious injury.

¶ 10        The jury was impaneled the following day, and various responding officers testified for the State. The surveillance video was published to the jury, and Sgt.

Miller was permitted to identify Defendant as the driver seen in the video based on his glasses, dreadlocks, and small frame. At trial, Defendant was not wearing glasses and his hair was longer than depicted in the video. Two other officers also testified that Defendant was the driver seen in the video based on their prior encounters with him. Defendant's counsel lodged a continuing objection to these identifications. One police witness testified without objection that Defendant declined to answer questions from a detective.

¶ 11      Defendant moved to dismiss all charges at the close of the State's evidence. The trial court denied that motion. Following closing arguments by counsel, instruction by the trial court, and deliberation, the jury found Defendant guilty on all counts. Defendant received a sentence of 120 to 156 months imprisonment on one count of discharging a weapon into occupied property inflicting serious bodily injury and a consolidated, consecutive sentence of the same length for the remaining offenses. Defendant's counsel told the trial court that he intended to give oral notice of appeal immediately after entry of judgment and, following sentencing, the trial court announced that "Defendant gives notice of appeal by way of counsel . . . to the North Carolina Court of Appeals." Defendant also filed a petition for writ of *certiorari*

with this Court seeking review in the event that the notice of appeal given at trial failed to comply with the technical requirements of N.C. R. App. P. 4 (2021).[1]

## II.  ANALYSIS

¶ 12        Defendant argues that the trial court: (1) erred in permitting three officers to offer their lay opinions identifying Defendant on the surveillance video; (2) erred in denying his motion to dismiss; and (3) plainly erred in allowing testimony regarding his silence into evidence.  We hold Defendant has failed to demonstrate error under each argument.

### A.  Standards of Review

¶ 13        We review a trial court's decision to admit lay opinion testimony for an abuse of discretion.  *State v. Williams*, 363 N.C. 689, 701, 686 S.E.2d 493, 501 (2009).  A denial of a motion to dismiss, by contrast, is reviewed *de novo*.  *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007).  Finally, for evidentiary error subject to plain error review, a defendant must show error and "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial."  *State v. Fraley*, 202 N.C. App. 457, 465, 688 S.E.2d. 778, 785 (2010).

---

[1] The State did not assert a lack of jurisdiction in its brief to this Court, nor did it oppose *certiorari* review in its response to Defendant's petition.  In light of these circumstances, and to the extent that Defendant's counsel's notice of appeal and the trial court's recognition thereof on the record failed to comply with the technical requirements of our appellate rules, we allow Defendant's petition for writ of *certiorari* in our discretion.

**B. Lay Opinion Testimony**

¶ 14      In his first argument, Defendant asserts that the trial court abused its discretion in allowing three officers to opine to the jury that Defendant is identifiable as the driver of the Dodge Avenger seen on the surveillance footage. Defendant requests plain error review to the extent that this argument was unpreserved by adequate objection. The State disagrees with Defendant as to preservation and on the merits, noting that the following factors weighed in favor of allowing lay opinion testimony: (1) the testifying officers had encountered Defendant prior to viewing the surveillance video; (2) the Defendant's appearance had changed between the night of the crime and trial; and (3) the quality of the surveillance video itself was poor. We agree with the State and hold that, regardless of whether his counsel's objection preserved this issue below, Defendant has not shown the trial court abused its discretion in allowing this testimony.

¶ 15      Rule 701 of our Rules of Evidence permits lay opinion testimony that is "(a) rationally based on the perception of the witness and (b) helpful to . . . the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2021). In the specific context of lay identification of a defendant on videotape, such testimony is admissible if it "is based on the perceptions and knowledge of the witness, the testimony would be helpful to the jury in the jury's fact-finding function rather than invasive of that function, and the helpfulness outweighs the possible prejudice to the

defendant from admission of the testimony." *State v. Belk*, 201 N.C. App. 412, 415, 689 S.E.2d 439, 441 (2009) (citation and quotation marks omitted). By natural corollary, such testimony is inadmissible when "the jury is as well qualified as the witness to draw the inference and conclusion that the person shown in the surveillance footage is the defendant." *State v. Weldon*, 258 N.C. App. 150, 155, 811 S.E.2d 683, 688 (2018) (cleaned up) (citation and quotation marks omitted).

¶ 16 This Court has identified the following factors as pertinent to the above analysis:

> (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance [video] was taken or when the defendant was dressed in a manner similar to the individual depicted in the [video]; (3) whether the defendant had disguised his appearance at the time of the offense; and (4) whether the defendant had altered his appearance prior to trial. . . .
>
> [C]ourts have also considered the clarity of the surveillance image and completeness with which the subject is depicted in their analysis.

*Belk*, 201 N.C. App. at 415-16, 689 S.E.2d at 441-42 (citations omitted). Critically, we consider the above factors pursuant to the abuse of discretion standard, and "we must uphold the admission of . . . lay opinion testimony if there was a rational basis for concluding that [the witness] was more likely than the jury to correctly identify

[the] [d]efendant as the individual in the surveillance footage." *Id.* at 417, 689 S.E.2d at 442 (citation omitted).

¶ 17    Reviewing the evidence in light of the above caselaw, we hold that the trial court could rationally conclude that the officers' lay opinion testimony identifying Defendant on the surveillance video was admissible under Rule 701. First, each of the officers testified that they had previously encountered Defendant before viewing the surveillance video. Second, the first officer to so testify—Sgt. Miller—noted that on the night of the shooting, he recognized Defendant based on the length of his dreadlocks and his distinctively thick eyeglasses, and that both of those identifying characteristics had changed between the crime and trial.[2] Third, the State notes, and Defendant does not dispute, the video's relatively poor quality. As each of these factors weighs in favor of admissibility, we decline to hold that the trial court irrationally allowed the officers' identifying testimony into evidence and abused its discretion as a result. *See Weldon*, 258 N.C. App. at 156, 811 S.E.2d at 689 (holding no abuse of discretion in admission of officer's lay identification from surveillance

---

[2] Though the other two officers did not describe in detail what distinguishing physical features led them to identify Defendant on the video, their testimony was largely duplicative and cumulative of Sgt. Miller's admissible testimony. *See, e.g., State v. Parker*, 140 N.C. App. 169, 182, 539 S.E.2d 656, 665 (2000) ("When one witness's testimony is properly admitted, erroneous admission of repetitive or cumulative subsequent testimony is not necessarily prejudicial.").

video when the witness had previously encountered the defendant and the defendant's hairstyle changed between the recording and trial).

¶ 18        We are unconvinced by Defendant's arguments that the trial court could not have conducted a proper Rule 701 analysis because: (1) it did not expressly reference the rule in its pre-trial ruling or during trial; (2) the trial court had not viewed the video at the time of the pre-trial ruling and did not make any express findings as to its quality; and (3) Defendant was not personally responsible for his changed appearance because his glasses were seized and introduced into evidence by the State.

¶ 19        As to Defendant's first argument, we note that Defendant's counsel never expressly argued that the testimony was inadmissible under Rule 701, mentioning only Rules 901, 1001, and 1002. In any event, the pre-trial ruling was entirely preliminary because the admissibility of testimony is not finally adjudged until it is presented into evidence. *State v. McCall*, 162 N.C. App. 64, 68, 589 S.E.2d 896, 899 (2004). The trial court had a full opportunity to consider the admissibility of the officers' testimony based on counsel's objection and in due consideration of all relevant factors—including the self-evident quality of the video published to the jury

alongside the officers' testimony.[3]  Finally, the exact cause of Defendant's changed

appearance is immaterial, as the rule is primarily concerned with whether the change

in appearance diminishes an unfamiliar juror's ability to identify the person seen on

video.  *See Weldon*, 258 N.C. App. at 156, 811 S.E.2d at 688-89 ("[B]y the time of trial,

the jury was unable to perceive the distinguishing nature of defendant's hair at the

time of the shooting. . . . Accordingly, in that defendant had changed his appearance

since the 2 April 2015 surveillance video, not only was [the testifying officer] qualified

to identi[f]y defendant in the video, but he was *better* qualified than the jury to do so."

(citation and quotation marks omitted)).  *See also U.S. v. Farnsworth*, 729 F.2d 1158,

1160 (8th Cir. 1984) ("This criteria is fulfilled where the witness is familiar with the

defendant's appearance around the time the surveillance photograph was taken and

the defendant's appearance has changed prior to trial. . . . These [differences in

appearance] made it difficult for the jury to make a positive identification from the

photographs.  Because the [witnesses'] frequent contacts [with the defendant]

familiarized them with his appearance prior to the robbery, the district court

considered their identification testimony helpful to the jury.").

---

[3] The clarity of the video is not dispositive where the testifying officer knew the defendant from prior encounters and the defendant's appearance changed between the video and trial.  *See Weldon*, 258 N.C. App. at 156, 811 S.E.2d at 689 (holding such testimony was admissible based on the latter two factors without discussion of the surveillance video's quality).

**C. Motion to Dismiss**

¶ 20        Defendant next argues that the trial court erred in denying his motion to dismiss the charges against him, asserting that there was insufficient evidence that he fired the bullets that struck the victim. We disagree.

¶ 21        A motion to dismiss is properly granted only when the State fails to present substantial evidence of each essential element of the charged offense. *State v. Golder*, 374 N.C. 238, 250, 839 S.E.2d 782, 790 (2020). We must view the evidence in the light most favorable to the State, giving it the benefit of "every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* Circumstantial evidence is considered equally probative as direct evidence. *State v. Jenkins*, 167 N.C. App. 696, 699, 606 S.E.2d 430, 432 (2005). Here, the State was required to introduce sufficient evidence showing "(1) the willful or wanton discharging (2) of a firearm (3) into any building (4) while it is occupied," *State v. Jones*, 104 N.C. App. 251, 258, 409 S.E.2d 322, 326 (1991), and that Defendant's commission of those acts caused bodily injury to another, N.C. Gen. Stat. § 14-34.1(c) (2021).

¶ 22        Defendant argues that the State's evidence fails to establish that he fired the shots that struck Ms. Tyree. But the testimonial, video, and physical evidence in this case, as well as the reasonable inferences drawn therefrom, show otherwise. Specifically, the video shows a man identified as Defendant get so close to the home that he leaves the camera's field of view, and debris flies on screen moments later.

Defendant reenters the frame and returns to his car, after which he points an object at the home and a flash is seen on screen. Then, as Defendant drives away, he points the object at the house again and another flash is observable from the driver's side of the vehicle. The officers' testimony, coupled with the video and several .40 caliber rounds, all fired from the same gun and recovered by police close to the house and in the street, support a reasonable inference that Defendant fired several shots into Ms. Tyree's home. And while it is true that another man can be seen on video pointing a gun at the house, the absence of any casings from another gun at the crime scene, the lack of any muzzle flash on screen, and the man's apparent attempts to manipulate the gun's firing mechanism all support a reasonable inference that he attempted but failed to successfully fire an inoperable firearm at the home. Viewed in the light most favorable to the State, this evidence sufficiently establishes all essential elements of the crime charged, namely that Defendant fired several bullets into Ms. Tyree's home and injured her as a result.

## D. Defendant's Silence and Plain Error

In his final argument, Defendant argues that the trial court plainly erred in permitting admission of the following testimony from a police officer:

> [THE STATE]: Okay. And, ultimately, you left 1332 Proctor Street?
>
> [THE WITNESS]: Yes. They weren't cooperative on the scene, and we didn't have charges at the time, so based on

what we had, we left the scene.

[THE STATE]: And when you say, "They weren't cooperative," what do you mean?

[THE WITNESS]: They weren't answering a lot of Detective Woods's questions. They weren't particularly happy that we were there speaking to them.

Later, the prosecutor stated in closing argument:

Now, from there, the officers admitted, "We didn't make an arrest. They didn't want to cooperate, so we had to clear the scene."

Now, ladies and gentlemen, that's what we want officers to do. At that point in time, all they had was a vague vehicle description, and they had no reason to effectuate an arrest. So what did they do? They cleared the scene, and gathered more information.

. . . .

And there is also the fact that it was Sergeant Miller who stopped the Defendant on that night, after they drove around the city trying to find these individuals that they first saw at 1332 Proctor Street. Once law enforcement said, "Hey, can we talk to you about a shooting?" once they said "We don't have anything for you," and got—you heard law enforcement went back to that residence several times that night trying to locate them and trying to locate that vehicle.

Defendant claims the admission of this testimony and the prosecutor's mentions of it in closing argument violated his constitutional right against self-incrimination under the Fifth Amendment to the United States Constitution and Article 1, Section 23 of the North Carolina Constitution.

¶ 24 Defendant has not shown plain error in the above testimony and closing argument. On plain error review, we must consider whether the State "emphasize[d], capitalize[d] on, or directly elicit[ed]" the inadmissible statements. *State v. Moore*, 366 N.C. 100, 106, 726 S.E.2d 168, 173 (2012). The prosecutor did none of those things here. The prosecutor did not ask the witness to comment on Defendant's silence and appears instead to have sought to contextualize law enforcement's decision to leave Defendant and Terry Green alone in the immediate aftermath of the shooting. The prosecutor's closing argument briefly mentioned Defendant's lack of cooperation only to describe law enforcement's actions in investigating the crime. Finally, the prosecutor did not rely on the challenged testimony to establish Defendant's guilt or any element of the crime charged. We therefore hold that the trial court did not plainly err under *Moore* and the applicable law.

### III. CONCLUSION

¶ 25 For the foregoing reasons, we hold Defendant received a fair trial, free from error.

PETITION FOR WRIT OF CERTIORARI ALLOWED; NO ERROR.

Judges GRIFFIN and JACKSON concur.