An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-625

Filed 6 May 2026

Buncombe County, Nos. 21CR085201-100, 21CR085202-100, 21CR085203-100, 21CR087345-100, 21CR087346-100, 21CR085199-100

STATE OF NORTH CAROLINA

v.

TYRELL DEVON WARREN

Appeal by defendant from judgment entered 1 August 2024 by Judge Craig Croom in Buncombe County Superior Court. Heard in the Court of Appeals 26 March 2026.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Thomas H. Moore, for the State.*
>
> *Vitrano Law and Mediation, by Sean P. Vitrano, for Defendant-Appellant.*

ARROWOOD, Judge.

Tyrell Devon Warren ("defendant") appeals from judgment entered after trial, where the jury found him guilty of second-degree murder, possession of a firearm by a felon, possession of a stolen motor vehicle, hit and run, assault with a deadly weapon, and robbery with a dangerous weapon.

I.    Background

The evidence tended to establish the following narrative of events, beginning in Asheville on the night of 12 June 2021 and ending with defendant's arrest in Monroe on 20 June 2021.

A.    Defendant's Activities between 12 June 2021 and 20 June 2021

On the evening of 12 June outside the AHOPE homeless shelter, Brian Wilson, Jr. ("Mr. Wilson"), Emily Derrick ("Ms. Derrick"), and Preston Pittman ("Mr. Pittman") observed defendant approaching them.  Defendant was a convicted felon living in Asheville and in love with Ms. Derrick, who in turn was involved in a relationship with Mr. Wilson.

A fight broke out when Mr. Wilson hit Ms. Derrick after defendant called her "Bae."  The three men were hitting each other with sticks and two-by-fours when Ms. Derrick called 911 at 11:35 p.m. and reported that one of the men had a gun.  Before police arrived, she saw the gun on the ground and covered it with her jacket. Defendant was seen walking away from AHOPE when police arrived, and Ms. Derrick, Mr. Wilson, and Mr. Pittman refused to speak with the officers.

A few hours later, in the early morning of 13 June, Ms. Derrick, Mr. Wilson, and Mr. Pittman were with another man in a parking lot at the base of the Jeff Bowen Bridge on Riverside Drive.  The men got into a white Subaru and asked Ms. Derrick to drive, but at that moment, she heard gunshots and hid behind a concrete pillar. She then saw that Mr. Wilson and Mr. Pittman had fallen on the sidewalk and she

called 911 again. At the scene, Ms. Derrick told police she did not see the shooter, but she consented to data extraction from her cell phone. Review of this data allowed police to identify defendant as a suspect.

Mr. Wilson was pronounced dead at the scene after a gunshot wound to the chest. During his autopsy, fragments of a .22-caliber bullet were collected from his chest; Dr. Jerri McLemore stated that "the bullet went through the heart and . . . through the right lung." Mr. Pittman was transported to Mission St. Joseph's Hospital with a gunshot wound on the upper left side of his chest but was released after treatment.

Shortly after midnight on 14 June 2021, Ari Sobel ("Mr. Sobel") reported that a black male in a hoodie stole his 2012 Kia Optima after threatening him with a gun. Mr. Sobel had been sleeping in his car near Clingman and Hilliard Avenues, and after the robbery, he had to flag down a passing driver for help while naked. Police entered the Kia's information in the stolen vehicle registry.

Around the time of this first robbery, another robbery took place about a mile away. John Kopp ("Mr. Kopp") was walking home from work on Haywood Road when he was robbed by a black man wearing a black hoodie and a mask. The thief pulled out a gun, demanded money, and shot at Mr. Kopp when he refused, grazing Mr. Kopp's arm. The thief stole his backpack and drove away in a sedan. Mr. Kopp called police, who determined that he did not require medical attention. Mr. Kopp reported that he was "pretty sure" the gun was a .22-caliber revolver, but Detective Patrick

DeStefano ("Detective DeStefano") observed that the wound "didn't look consistent with a through-and-through gunshot," and instead looked like it was caused by an "airsoft" pellet or "something similar." Investigators were later able to place defendant's phone at the times and locations of both robberies.

Later that morning, Lucas Haley ("Mr. Haley") discovered that his 2018 Toyota Tacoma truck was not in his apartment's parking lot, and he reported it stolen with the police. He also reported his vehicle's information on a public Facebook group called "West Asheville Exchange."

Defendant drove Mr. Haley's Tacoma to Ms. Derrick's home in the Asheville Terrace apartment complex that evening to retrieve an audio speaker. A member of the Facebook group saw the truck enter the complex, and she quickly reported the sighting. Soon after, Sergeant Bryan Hunter of the Buncombe County Sheriff's Department saw the Tacoma and attempted to stop the truck, but defendant fled and began a high-speed chase. After driving through several residential streets, defendant crashed the truck in the Five Points neighborhood and fled on foot, stealing a nearby bicycle. Police searched the crashed Tacoma and recovered a .22-caliber firearm with one spent round and five live rounds, a black mask, a backpack, and a wallet with cards in defendant's name.

In the subsequent days, defendant and Ms. Derrick remained in communication. Ms. Derrick learned that defendant was a suspect in the 14 June shootings and warned him not to return home. Defendant also sent Ms. Derrick a

video, in which he wears a mask and confesses to the killing. Ms. Derrick met defendant at the IHOP on Tunnel Road, where he pulled up in the stolen Kia and drove them for about an hour to Monroe. She did not remember which day this drive occurred.

When the Kia arrived in the Monroe Crossing shopping mall parking lot on 20 June, a license plate reader alerted police to the presence of the stolen Kia. Police located the empty car and waited for its driver. Exiting the mall, defendant saw the officers and attempted to run, but a police dog bit him and police took him into custody. Defendant identified himself and, after police issued Miranda warnings, he told the officers he "took a life to save a life."

### B.    Subsequent Procedural History

On 22 June 2021, after his arrest, Sam Snead ("Mr. Snead") of the Buncombe County Public Defender's Office was appointed to represent him on these charges. On 1 November 2021, defendant was indicted on charges of first-degree murder, possession of a firearm by a convicted felon, possession of a stolen motor vehicle, failure to stop after a hit-and run for property damage, assault with a deadly weapon with intent to kill, and robbery with a dangerous weapon. That month, Mr. Pittman, the only eyewitness to the 13 June shooting, died of a drug overdose.

On 18 February 2022, defendant was moved from Buncombe County custody to Union County. Three days later, he pled guilty in Union County Superior Court to one count of Felony Possession of a Stolen Motor Vehicle and received an active

sentence of 10 to 21 months, with a scheduled release on 17 December 2022. The Union County case concerned the possession of Mr. Sobel's Kia, recovered in Monroe.

On 19 July 2022, defendant filed a *pro se* motion requesting a speedy trial pursuant to N.C.G.S. § 15A-711. On 5 December 2022, the State submitted its Application and Writ of Habeas Corpus signed by Buncombe County Superior Court Judge Alan Z. Thornburg. Pursuant to defendant's motion, his cases were scheduled on the Buncombe County Superior Court Motion and Plea Addendum calendar for 12 December 2022, before the Honorable Judge Gregory Horne. The State notified the court about the motion but "due to him having counsel, the State was not intending to address [it.]" Neither defendant nor Mr. Snead addressed the *pro se* motion at that appearance. Instead, the court heard Mr. Snead's motion and subpoena requesting defendant's DSS records and denied the State's motion to quash this request. Defendant was also transferred to Buncombe County custody pending trial on the instant charges.

On 31 May 2023, defendant and Mr. Snead filed a motion asking the court to consider his *pro se* claim. Defendant's next hearing was calendared for 5 June 2023, where the court heard the State's response requesting that the court either not hear the motion or deny it after finding that the State was in compliance. On 29 September 2023, the court issued an order denying defendant's motion to dismiss for a violation of G.S. § 15A-711, because defendant failed to timely assert or argue the motion in court on 12 December 2022, was continually represented by counsel

and could not file *pro se* motions, and because the State complied with its statutory requirements. The court found that Mr. Snead did not adopt defendant's *pro se* motion or offer argument on the merits.

On 1 November 2023, Mr. Snead moved to withdraw due to an impasse with defendant, which was allowed the following week with defendant's knowing and free assent. Ted J. Besen ("Mr. Besen") was appointed to represent defendant in the instant case. Mr. Besen moved for a speedy trial on 16 January 2024. The State scheduled trial for the weeks of 3 June 2024 and 10 June 2024 "in response to" this motion. This trial date was later amended by about six weeks, due to the courts' training schedule during the transition implementing the "eCourts" platform.

Following re-assignment of the State's counsel, Assistant District Attorney Kyle Sherard ("Mr. Sherard") reviewed the case file and discovered it was missing the motion and response heard 5 June 2023 and informed both Mr. Besen and Mr. Snead. On 22 April 2024, the State and Mr. Snead filed a joint notice re-filing this motion and response. On 8 July 2024, defendant filed another *pro se* motion to dismiss the charges against him based on his right to speedy trial.

Approximately three years and one month elapsed between defendant's arrest and the beginning of the trial in Buncombe County Superior Court on 22 July 2024 before the Honorable Craig Croom. The court denied defendant's 8 July motion to dismiss after conducting a pre-trial hearing, adopting the findings of fact and conclusions of law from the 29 September 2023 order. The trial court dismissed one

of the robbery charges at the outset of the trial, and the State voluntarily dismissed the misdemeanor assault charge, as well as a charge of having attained the status of habitual felon. At the close of the State's evidence, defendant moved to dismiss all charges against him for insufficiency of the evidence, but the court denied this motion.

### C. Defendant's Testimony and Evidence in his Defense

Defendant gave evidence in his own defense. He testified that he went home after the fight at AHOPE, but returned to downtown Asheville with a gun after Ms. Derrick told him to meet her there. He claimed she told him she planned to rob a person who had asked her for a ride home, and that he followed the group to the park under the Jeff Bowen Bridge. Defendant contended that he tried to convince Ms. Derrick not to drive off with the men to commit a robbery and tried to take her keys, which led to another fight with Mr. Wilson and Mr. Pittman. Defendant testified that he fired a warning shot, but that the gun went off accidentally during a scuffle with Mr. Wilson, hitting Mr. Pittman, after which he intentionally shot Mr. Wilson twice during a prolonged struggle. He also claimed that Ms. Derrick observed the entire incident.

He denied that he committed either of the two robberies on 14 June 2021, and claimed that he took both the Kia and Tacoma after finding them unlocked and unattended with keys inside. He also claimed that he traveled to Monroe in the Kia, staying there until Ms. Derrick asked him to return to Asheville and pick her up, after which they spent time in a hotel having sex, and he brought her to the mall to

- 8 -

pay for her to have her nails done.

Defendant also called Sergeant Melissa Lackey ("Sergeant Lackey"), who spoke with Mr. Kopp on 14 June. She described Mr. Kopp's injury as extremely minor, confirming that officers thought it could have been caused by a BB gun, but that Mr. Kopp was confident the weapon was a small revolver.

### D. Verdicts and Judgments

On 1 August 2024, the jury acquitted defendant of first-degree murder, but convicted him of second-degree murder, possession of a firearm by a felon, possession of a stolen motor vehicle, hit and run, assault with a deadly weapon, and robbery with a dangerous weapon. The trial court entered two judgments and sentenced defendant to consecutive sentences of between 336 and 416 months and between 89 and 119 months. Defendant gave notice of appeal in open court.

### II. Discussion

Defendant contends that the trial court erred by denying his motions to dismiss for violation of his right to speedy trial, by failing to instruct the jury on the lesser-included offense of common law robbery because the "evidence showed the weapon was not a firearm," and by entering judgment for both robbery with a dangerous weapon and assault with a deadly weapon arising out of the same incident. We discuss each argument in turn.

### A. Defendant's Motions Asserting his Right to Speedy Trial

As a preliminary matter, because "[t]here is no right to appear both *in propria*

*persona* and by counsel[,]" a defendant cannot file *pro se* motions on his own behalf or represent himself at trial whenever he is already represented by defense counsel. *State v. Williams*, 363 N.C. 689, 700 (2009) (citations and quotes omitted). Here, defendant filed two separate *pro se* speedy trial motions while represented by counsel. The first motion was denied in the court's order following the 5 June 2023 hearing, where Mr. Snead neither adopted the motion nor argued for its merits. Defendant never appealed this order and it is therefore unpreserved for review. However, the trial court conducted a hearing on his second speedy trial motion on 23 July 2024, wherein defense counsel adopted the motion and argued the merits according to the *Barker* factors, and the court adopted the findings and conclusions of the previous order. Accordingly, we address the merits of defendant's motion for speedy trial on appeal.

A criminal defendant's right to a speedy trial is guaranteed by the Constitutions of both the United States and North Carolina. U.S. Const. amend. VI; N.C. Const. art. I, § 18. We review *de novo* a trial court's denial of a criminal defendant's motion to dismiss on speedy trial grounds. *State v. Farook*, 381 N.C. 170, 178 (2022) (citing *State v. Williams*, 362 N.C. 628, 632–33 (2008)). The U.S. Supreme Court identified four factors for courts to assess before finding a violation of this right: "[1] Length of delay, [2] the reason for the delay, [3] the defendant's assertion of [the right to a speedy trial], and [4] prejudice to the defendant resulting from the delay." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). This jurisprudence has been adopted in

North Carolina, and we also apply this analysis to analogous claims under the North Carolina Constitution. *State v. Webster*, 337 N.C. 674, 678 (1994) (citations omitted).

We first consider the issue of delay. Time is not *per se* determinative of a speedy trial violation. *Webster*, 337 N.C. at 678. However, a post-accusation delay of one year "marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* inquiry." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). The timeline in defendant's case more than exceeds this threshold, obligating us to weigh this factor in his favor.

As to the reasons for such delay, defendants generally must show the prosecution's neglect or willfulness. *Webster*, 337 N.C. at 679. However, a delay of such length creates "a prima facie showing that the delay was caused by the negligence of the prosecutor sufficient to shift the burden of proof to the State to rebut and offer explanations for the delay." *State v. Crisp*, 297 N.C. App. 400, 403 (2024) (cleaned up).

On this issue, the State provided a litany of justifications for this extended delay both at trial and on appeal. First, shortly after his indictment in Buncombe County, defendant was convicted and incarcerated in Union County for possession of a stolen vehicle. Then, in July 2022, the assistant district attorney for this prosecution departed, and Mr. Sherard was assigned as the State's new counsel in the case that fall. The same day, Mr. Sherard requested defendant's transport to Buncombe County and "timely called the case up to address the motion" at the

12 December 2022 hearing. But Mr. Snead addressed the motion at neither this hearing nor the hearing that followed. Instead, Mr. Snead was heard on defendant's motion and subpoena requesting access to DSS records. The State described this as an "effort[ ] to potentially mitigate circumstances if the case were to go to trial or to a plea."

A complex discovery process ensued, during which Mr. Snead withdrew from the case with defendant's approval due to their impasse. Soon after Mr. Besen's appointment, the State received the second *pro se* motion and filed "an immediate notice" of the new trial date, and the parties did not receive notice until April about the "eCourts" transition necessitating the final delay. In addition, both Mr. Besen and Mr. Sherard were working on a separate two-week double homicide trial scheduled for March 2024. The State was also requesting voluntary discovery from defendant as late as January 2024.

A defendant "who has caused or acquiesced in a delay" of his trial "will not be permitted to" argue that he was denied his constitutional right to speedy trial. *State v. Tindall*, 294 N.C. 689, 695–96 (1978). Since the delay can be attributed in part to defendant's acquiescence in Mr. Snead's withdrawal and his defense's strategic December 2022 motion to compel discovery, we must conclude that neglect or willfulness by the State is insufficient to explain defendant's prolonged wait for trial.

Further, our Supreme Court has stated:

> The constitutional guarantee does not outlaw good-faith

> delays which are reasonably necessary for the State to prepare and present its case . . . .  Neither a defendant nor the State can be protected from prejudice which is an incident of ordinary or reasonably necessary delay.  The proscription is against purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort.

*State v. Johnson*, 275 N.C. 264, 273 (1969) (citations omitted).

The record before us largely supports the State's assertions that the discovery process was particularly complex.  Additionally, some delay due to ordinary staff turnover is to be expected, as are clogged court dockets and public defenders preparing for multiple demanding trials at once.  Indeed, "[b]oth crowded dockets and lack of judges or lawyers, and other factors, make some delays inevitable." *State v. Brown*, 282 N.C. 117, 124 (1972) (citation omitted).  Accordingly, the State met its burden to show the delays were reasonably necessary, in good faith, and due in part to defendant's acquiescence.

On the third *Barker* factor, defendant asserted his right to speedy trial in two *pro se* motions, but he filed both while represented by counsel.  The first was denied, with the court finding the State met its requirements.  Mr. Besen filed a proper motion asserting this right on 16 January 2024, and the State promptly scheduled his case for trial in response.  Moreover, when defendant filed the second *pro se* motion in July 2024, his trial was already scheduled to begin in under two weeks.  Defendant's motions certainly do not weigh against him on this factor, but given the surrounding circumstances, these assertions do not weightily support his

- 13 -

Constitutional argument.

Finally, defendant must show actual, substantial prejudice arising from delay. *State v. Spinks*, 277 N.C. App. 554, 566 (2021). On this prong, we consider the speedy trial right's three objectives: (1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and most importantly, (3) limiting the possibility of an impaired defense. *Barker*, 407 U.S. at 532, *see also Webster*, 337 N.C. at 681.

Defendant's central contention on this prong is that Mr. Pittman's death in November 2021 prejudiced him, because Mr. Pittman's testimony "would have been valuable to the defense" because it was "necessary to corroborate [defendant's] testimony that Wilson was the aggressor, and that [defendant] acted in self-defense."

First, defendant offers no facts which would support the speculation that Mr. Pittman would have testified in his defense, undermining any suggestion that actual prejudice necessarily resulted therefrom. Second, actual and substantial prejudice must result from the delay itself, but defendant does not contend that Mr. Pittman's death had any causal relationship with this delay. In fact, his death occurred in the same month as defendant's indictment on these charges, long before the other events that more plausibly caused delay. We agree with the court's finding that "the State is more prejudiced by his death than the defendant." Nevertheless, we acknowledge the sincerity of defendant's "anxiety and concern" attending his prolonged pre-trial incarceration.

In sum, although this was indeed a lengthy delay, the record shows that defendant was a victim of unfavorable circumstances rather than the State's neglect or willfulness, and any prejudice resulting therefrom is insufficiently substantial to require dismissal. Accordingly, we find no error and hold that the State did not violate his right to speedy trial.

## B.     Jury Charge

Defendant argues next that the trial court reversibly erred by instructing on robbery with a dangerous weapon but omitting instructions on the lesser included offense of common law robbery. "It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803 (1988) (citation omitted). Failing to instruct a jury on a lesser-included offense "constitutes reversible error that cannot be cured by a verdict finding the defendant guilty of the greater offense." *State v. Lawrence*, 352 N.C. 1, 19 (2000) (citations omitted).

Parties who objected at trial and stated the grounds to contest any portion of the jury charge or omissions therefrom properly preserve the issue for appeal, and this Court reviews *de novo* the trial court's decision. N.C. R. App. 10(a)(2) (2024); *State v. Osorio*, 196 N.C. App. 458, 466 (2009). When objections are unpreserved, we review jury instructions for plain error. *State v. Gregory*, 342 N.C. 580, 584 (1996).

Plain error is a much higher and more "exacting prejudice standard[,]" and it is not necessarily met even if we conclude the trial court committed an error which

would have been reversible under *de novo* review. *State v. Reber*, 386 N.C. 153, 158–63 (2024). To show plain error, defendant must first show that a fundamental and "grave" error occurred at trial, amounting to "a denial of a fundamental right of the accused[.]" *State v. Odom*, 307 N.C. 655, 660 (1983) (citation omitted). Defendant then must show both that the "error is an exceptional case," which requires a showing that it "seriously affects the fairness, integrity, or public reputation of judicial proceedings" and that the error "had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict." *Reber*, 386 N.C. at 158 (cleaned up, citations and quotation marks omitted). "In ordinary English usage, an event will 'probably' occur if it is 'almost certainly' the expected outcome; it is treated as synonymous with words such as 'presumably' and 'doubtless.'" *Id.* at 158.

The elements of robbery with a dangerous weapon are: (1) the unlawful taking of another's property; (2) with the actual or threatened use of a dangerous weapon; (3) by which another person's life is threatened. *State v. Bellamy*, 159 N.C. App. 143, 147 (2003). "Common law robbery is a lesser-included offense of robbery with a dangerous weapon." *State v. Clevinger*, 249 N.C. App. 383, 392 (2016) (citation omitted). Common law robbery does not require proof that the defendant used a firearm or dangerous weapon. *State v. Wise*, 269 N.C. App. 105, 107 (2019). A defendant is entitled to instruction on the lesser included offense of common law robbery where either the State or the defendant offers evidence that the weapon used

was not a firearm. *Id*. at 108 (citing *State v. Joyner*, 312 N.C. 779, 783–84 (1985)). In the context of a robbery with a dangerous weapon charge, a BB gun is not a firearm or a dangerous weapon. *State v. Allen*, 317 N.C. 119, 123–26 (1986) ("No matter what an instrument appears to be, if in fact it is a cap pistol, or a toy pistol, or some other instrument incapable of threatening or endangering life, it cannot be a firearm or other dangerous weapon within the meaning of the armed robbery statute.").

A trial court "is required to instruct the jury on lesser included offenses whenever there is some evidence to support" the lesser-included offense. *Wise*, 269 N.C. App. at 107 (quoting *State v. Wright*, 304 N.C. 349, 351 (1981)); *see also State v. Millsaps*, 356 N.C. 556, 561 (2002) (instruction required so long as the evidence is sufficient to "permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater offense.").

At trial, this charge concerned the robbery of Mr. Kopp's backpack on 14 June. Defendant contends that the jury heard conflicting evidence that defendant brandished either the .22-caliber firearm or the BB gun. Defendant relies heavily on this Court's decision in *State v. Wise*, in which we vacated an armed robbery conviction and remanded for a new trial, because a detective testified that the defendant confessed to the robbery but claimed he used a BB gun painted black, and precedent required this relief pursuant to *State v. Alston*, 305 N.C. 647 (1982). *Wise*, 269 N.C. App. at 106–108. In *Alston*, an accomplice to a robbery testified that he brandished a BB gun, while victims testified they were certain it was a firearm, and

because the conflicting information may have "prove[d] the absence of an element" of the higher offense, instructions on common law robbery were required. *Alston*, 305 N.C. at 649–51.

However, our previous conclusion does not require the same result here. The *Wise* panel applied *de novo* review because the argument was preserved at trial, while the instant case requires plain error review. Accordingly, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *State v. Melvin*, 364 N.C. 589, 594 (2010) (citation omitted). Here, to determine whether an alleged defect in the jury instructions rises to the exceptional level of plain error, we must examine the entire record and conclude that the defect identified doubtless impacted the jury's guilty verdict. *Odom*, 307 N.C. App. at 661. To determine whether the record contains sufficient evidence to require jury instructions about the lesser included offense, we must view this evidence in the light most favorable to the defendant. *State v. Brewington*, 179 N.C. App. 772, 779 (2006).

We begin with the State's evidence about the robbery of Mr. Kopp's backpack. Detective DeStefano testified that Mr. Kopp reported to him that he was robbed at gunpoint by a black male who shot him in the forearm with what he believed was a .22-caliber revolver. The jury watched his body cam footage, including this interview with Mr. Kopp, but it is not included in the record. On cross-examination, Detective DeStefano confirms that Mr. Kopp said he was "shot with a .22" but he says the

wound did not "look consistent with . . . a through-and-through gunshot where it actually hits and goes all the way through the internal layers of your body." On redirect, however, Detective DeStefano clarified that "bullets can graze skin" and "don't always have to enter the body[,]" and that a smaller-caliber weapon like a .22-caliber firearm "would cause less damage than a high-caliber weapon."

Mr. Kopp testified: "It looked like a revolver, you know. I'm not an expert, but maybe, like, a .38 or something . . . . Something pocketable for sure." He testified that the gunshot's echo on the building was "really loud" and that the bullet grazed him. On cross-examination, he testified that he knew it was a revolver from its shape but clarified that although he goes shooting with family on occasion, he has minimal knowledge of firearms. He describes the gun as smaller than the shooter's grip, with a cylinder rather than a magazine. He says he was certain it was "a real gun because I've shot guns, and it definitely wasn't, like, quiet. It wasn't like a .22, but . . . ." However, he says, "I don't think it was a BB gun because BB guns aren't that loud, and I heard the echo behind me. It was crazy loud, like a 9-millimeter or something, like a regular bullet."

Defendant testified in his defense and denied he was on Haywood Road at the time of the robbery. Defendant also called Sergeant Lackey, who also spoke with Mr. Kopp on the scene, and whose body cam footage was introduced at trial but not included in the record. She did not remember what Mr. Kopp's injury looked like but confirmed that the footage records her describing it as "like a little zit." She confirmed

- 19 -

that she heard Mr. Kopp say it could have been a BB gun, but that he is pretty sure it was a revolver. She says, "I did not see that he had been shot with a .22." But on cross-examination, Sergeant Lackey confirmed that, in her 25 years of experience, she has also seen gunshot wounds that are "just a graze." She also said that, although "[n]o one else saw that gun but Mr. Kopp[,]" "everyone on scene is telling [Mr. Kopp] it's a BB[,]" but "he's pretty confident it was a revolver, short barrel gun, a .22."

Viewed in isolation and in the light most favorable to defendant, it seems the above testimony amounts to conflicting evidence as to the type of gun used. However, this Court must come to its conclusion based on the entire record, which offers extensive material contextual evidence about defendant's activity surrounding these events.

Detective Jacob Kielson testified that just after midnight, he was dispatched to the area of Clingman Avenue and Hilliard Avenue, where Mr. Sobel reported the robbery of his grey Kia Optima at gunpoint. Detective DeStefano confirmed that the Kia's theft occurred a short drive from Haywood Road, about a mile away. He also confirms the call about the Hilliard Avenue incident that came in while he was driving to Haywood Road, and officers immediately postulated that the incidents were related. In addition, the jury heard expert testimony placing defendant's phone at the time and place of both robberies. Moreover, defendant pled guilty to possessing the Kia, and one element of this offense was his knowledge that the vehicle was stolen.

Asheville Police Department forensic technician Mark Scholtz testified about processing the evidence collected from the crashed Toyota Tacoma. This includes the recovered firearm, an Rg .22-caliber with a fired round and five live rounds in its cylinder. Asheville Police Department forensic unit crime scene investigator Leigh Thomas testified that she attended Mr. Wilson's autopsy and concluded that he was shot with a .22-caliber firearm. In June 2021, she requested that the state crime lab test the .22-caliber projectile collected from Mr. Wilson's body to see if it had been fired from the only firearm recovered in this case, but as of July 2024, it had not yet been processed.

Defendant's testimony included the admission that, when he left home to meet Ms. Derrick after the fight outside the AHOPE shelter, he brought a gun "[f]or protection because [he] knew that Preston had a gun," and that this was the gun which shot both Mr. Wilson and Mr. Pittman. He also admitted to crashing the Tacoma in which police located the .22-caliber firearm. Further, although extensive searches were conducted, including a search of a nearby body of water, no firearm was uncovered at the scene of the homicide, and no other guns of any kind were ever recovered in relation to defendant's case.

Looking at the whole record, it becomes clear that any testimony suggesting the weapon used to rob Mr. Kopp might have been a BB gun was woven into a much more detailed and compelling tapestry of contrary evidence. As a whole, this evidence tends to show: that defendant brought a .22-caliber firearm to the Jeff Bowen Bridge

and took that weapon with him when fleeing; that defendant next used the firearm to steal Mr. Sobel's Kia, leaving his victim naked in the street and flagging down cars for help; that defendant drove the stolen Kia to Haywood Road, where he fired at Mr. Kopp, grazing him and stealing his backpack before driving away in the Kia; and that he held onto this firearm until he ran from the stolen Tacoma he wrecked during his high-speed chase. Police never collected physical evidence consistent with the firing of a BB gun. Mr. Kopp, the only eyewitness to his robbery, testified that he was certain defendant fired with a small revolver, rather than a BB gun, although his grazing wound was so small that either a .22-caliber firearm or a BB gun could have caused it.

Absent this context, the testimony about the hypothetical BB gun may arguably have sufficed to "permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater offense." *Millsaps*, 356 N.C. at 561. But on plain error review, we must ask whether *the record as a whole* contains conflicting evidence, such that the court's omission of instructions on the lesser included offense constitutes an exceptional, fundamental, and grave error affecting the fairness, integrity, or public reputation of judicial proceedings, and that including the instruction doubtless would have required the jury to come to a different verdict.

Overall, this record only "conflicts" on this issue insofar as a meteorologist forecasting a 99% chance of rain makes a "conflicting" prediction on the odds of precipitation. The BB gun testimony constitutes nowhere near enough evidence for

us to conclude that a common law robbery instruction would have made a different outcome likely, let alone probable, almost certain, presumable, or doubtless. Therefore, we conclude that the trial court's omission of the common law robbery instruction does not reach the extremely high plain error standard.

### C.    Double Jeopardy

Defendant next contends that, because he was convicted in the theft of Mr. Kopp's backpack for both robbery with a dangerous weapon and assault with a deadly weapon, we must arrest judgment on the assault charge for violation of his rights under the double jeopardy clause. Defendant concedes that he did not raise the issue of double jeopardy at trial, but requests that we invoke Appellate Procedure Rule 2 to review his sentencing.

"Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal." *State v. Tirado,* 358 N.C. 551, 571 (2004). However, this court has discretion to review unpreserved double jeopardy arguments. *State v. Mulder*, 233 N.C. App. 82, 86 (2014). Under Rule 2, we may "suspend or vary the requirements or provisions" of any of the other Appellate Procedure Rules "[t]o prevent manifest injustice to a party[.]" N.C. R. App. P. 2 (2024).

The question for this Court is whether reviewing his double jeopardy argument would prevent manifest injustice to defendant, which would permit us to invoke Rule 2. The trial court consolidated these two charges for sentencing. "When the trial court consolidates multiple convictions into a single judgment but one of the

convictions was entered in error, the proper remedy is to remand for resentencing[.]" *State v. Hardy*, 242 N.C. App. 146, 160 (2015) (citation omitted). The State argues that vacating the assault conviction would have had no effect: "Even if the sentencing for the Defendant's assault with a deadly weapon conviction was arrested, the length of his prison sentences would not change." Under this reasoning, any injustice suffered by defendant is abstract rather than manifest.

However, although the trial court expressly consolidated the offenses, the record contains nothing to ensure us that, in calculating defendant's total sentence, it gave no weight to the consolidated lesser included charge. When the trial court consolidates multiple convictions into a single judgment, but one of the convictions was entered in error, the proper remedy is to remand for resentencing when this Court is "unable to determine what weight, if any, the trial court gave each of the separate convictions . . . in calculating the sentences imposed upon the defendant." *State v. Moore*, 327 N.C. 378, 383 (1990). Accordingly, due to the possibility of manifest injustice below, we invoke Rule 2 in our discretion to consider defendant's double jeopardy argument.

Both the Fifth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution prohibit multiple punishments for the same offense absent clear legislative intent to the contrary. U.S. Const. amend. V; N.C. Const. art. I, § 19; *see also State v. Etheridge*, 319 N.C. 34, 50 (1987). We review double jeopardy issues *de novo*. *State v. Williams*, 201 N.C. App. 161, 173 (2009).

The double jeopardy clause prohibits multiple convictions for the same offense. *State v. Ezell*, 159 N.C. App. 103, 106 (2003). Assault with a deadly weapon is a lesser included offense of robbery with a dangerous weapon. *State v. Hinton*, 361 N.C. 207, 210 (2007). When a defendant is convicted of these two offenses arising out of the same incident, a trial court should arrest judgment on the lesser-included offense. *State v. Richardson*, 279 N.C. 621, 628 (1971). Accordingly, defendant is correct that the conviction on this lesser included offense violated double jeopardy.

When two offenses are consolidated for judgment, "it is probable that a defendant's conviction for two or more offenses influences adversely to him the trial court's judgment on the length of the sentences imposed[.]" *State v. Wortham*, 318 N.C. 669, 674 (1987). Accordingly, because conviction on these two offenses violated defendant's right against double jeopardy, the State's argument that the trial court's sentence did not prejudice defendant is unavailing. We are therefore required by precedent to vacate defendant's conviction for assault with a deadly weapon and remand for resentencing.

## III. Conclusion

For the foregoing reasons, we hold that the trial court committed no error in concluding that defendant's right to speedy trial was not violated and no plain error in omitting a jury instruction about common law robbery. However, we vacate defendant's conviction for assault with a deadly weapon and remand for resentencing on defendant's robbery with a dangerous weapon conviction.

NO ERROR IN PART, NO PLAIN ERROR IN PART, VACATED IN PART, AND REMANDED.

Judges GORE and MURRY concur.

Report per Rule 30(e).