An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-897

Filed 20 May 2026

Guilford County, No. 21CR087135-400

STATE OF NORTH CAROLINA

       v.

ALEXANDER FERNANDEZ

Appeal by defendant from judgment entered 18 December 2024 by Judge Tonia Cutchin in Guilford County Superior Court. Heard in the Court of Appeals 25 March 2026.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General M. Lynne Weaver, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Callie S. Thomas, for defendant-appellant.*

ZACHARY, Judge.

Defendant Alexander Fernandez appeals from the trial court's judgment entered upon a jury's verdict finding him guilty of voluntary manslaughter. On appeal, Defendant argues that the court erred by admitting certain evidence at trial. After careful review, we conclude that the trial court did not err.

## I.    Background

On 21 March 2022, a Guilford County grand jury indicted Defendant for the second-degree murder of his son, Raymon Fernandez; on 5 August 2022, the grand jury returned a superseding indictment for the same charge.

This matter came on for jury trial on 9 December 2024. The trial court heard Defendant's motion in limine to exclude "testimony or video clips that reference," *inter alia*, "[p]rior or subsequent allegations of assaultive behavior by . . . [D]efendant, including the allegations of assault of Japha Payne-Daughtry on November 21, 2021."[1] The court denied the motion.

 Evidence presented at trial tended to show the following:

In the afternoon of 20 November 2021, Greensboro Police Officer Adrian McIntosh responded to a call at Defendant's residence. When Officer McIntosh arrived, the front door was open. Officer McIntosh announced himself and entered the house, where he saw Defendant walking down the stairs.

Defendant reported to Officer McIntosh that "his son was acting a fool and something was wrong with him." Defendant told him that "his son had fallen down and hit his head" and was in the upstairs bathroom. Officer McIntosh discovered Defendant's son, Raymon, on the bathroom floor. Although Raymon remained conscious, he "wasn't all the way there" and had "blood on his head." Raymon was transported by ambulance to the hospital.

---

[1] Based on review of the record, the trial transcript, and the appellate briefs, it appears that the assault of Payne-Daughtry occurred on 27 November 2021 rather than 21 November 2021.

On 27 November 2021, Raymon died. The autopsy report revealed that the cause of death was "complications of significant blunt force injury involving the head" and the manner of death was homicide. The report was admitted into evidence as State's Exhibit Number 65.

At trial, Japha Payne-Daughtry testified that he had been living at Defendant's house for five or six months before the incident on 20 November 2021. Payne-Daughtry continued to stay at the house, in Raymon's room, after Raymon was admitted to the hospital. While Raymon was in the hospital, Defendant told Payne-Daughtry that he did not "belong in [Raymon's room]. Get out of here." Despite Defendant's statements, Payne-Daughtry remained at the house and "it was all quiet for maybe like a few days."

According to Payne-Daughtry, after Raymon died on 27 November, Defendant "just snapped" and "decided to kick [Payne-Daughtry] out." Defendant told Payne-Daughtry: "I'm tired of your stuff. You need to get out. You need to get the F out. You need to get out." Payne-Daughtry agreed to leave after collecting his possessions; however, Defendant "made [Payne-Daughtry] get out of the house without [his] belongings," stating, "that's my stuff now."

Defendant then added: "I'll be back. I'm going just around the corner." When Defendant left, Payne-Daughtry hurried into the house to "quickly pack [his] things before [he] could come back." Yet when Payne-Daughtry exited the house, Defendant was "outside there waiting for [him] . . . . that's when [Defendant] attacked [him]."

Defendant "grabbed" him and "slung [him] on the ground." Then Defendant "started wailing on [his] face" and "head-butted" him.

A neighbor called 9-1-1 and Greensboro Police Officer Mike Phouthavong responded to the call. Over Defendant's objection, Officer Phouthavong testified that Payne-Daughtry reported that "he was trying to gather his items when [Defendant] had assaulted him by head-butting him and . . . punching him." Officer Phouthavong observed "a one-inch laceration above [Payne-Daughtry's] left eyebrow and bleeding from his left cheek."

Over Defendant's objection, the trial court admitted the body-worn camera footage of Payne-Daughtry and Officer Phouthavong discussing the attack into evidence as State's Exhibit Number 1, which was published to the jury.

CSI Forensic Specialist Christa Leonard, with the Greensboro Police Department, also testified at trial. On 2 December 2021, she executed a search warrant "related to a possible homicide investigation" at Defendant's home. In a bonus room over the garage—where the attack occurred—she observed bloodstains on a wall, an attic door, a trash bag of clothing, and a chair. Over Defendant's objection, Leonard testified that the bloodstains on the attic door and other "small apparent bloodstains" in the room were "transfer" stains, which were created when "an object that was already stained in blood came in contact with the wall."

On 13 December 2024, the jury returned its verdict finding Defendant guilty of voluntary manslaughter. On 18 December 2024, the trial court entered its

judgment sentencing Defendant to 64 to 89 months' imprisonment in the custody of the North Carolina Department of Adult Correction.

Defendant gave oral notice of appeal.

## II. Discussion

Defendant argues that the trial court committed reversible error (1) by admitting certain Rule 404(b) evidence, and (2) by permitting lay witness testimony as to bloodstain evidence.

### A. Admission of Rule 404(b) Evidence

Defendant first argues that "the trial court committed reversible error by admitting evidence of an altercation between [Defendant] and Payne-Daughtry under Rule 404(b) because the evidence was irrelevant and admitted for improper purposes." We disagree.

#### 1. Standard of Review

"When the trial court has made findings of fact and conclusions of law to support its [Rule] 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions." *State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012). "When the admission of the same evidence is challenged based on both Rules 404(b) and 403, we review the evidence on 404(b) grounds first before turning to Rule 403." *State v. Jones*, 288 N.C. App. 175, 179, 884 S.E.2d 782, 788 (2023). "We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the

trial court's Rule 403 determination for abuse of discretion." *Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159.

### 2. Rule 404(b)

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2025).

Our Supreme Court "has repeatedly held that Rule 404(b) states a clear general rule of *inclusion*." *State v. Pabon*, 380 N.C. 241, 258, 867 S.E.2d 632, 644 (2022) (cleaned up). Indeed, "relevant evidence of past crimes, wrongs, or acts by a defendant are generally admissible for any one or more of the purposes enumerated in Rule 404(b)'s non-exhaustive list, subject to but *one exception*": evidence is excluded "if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *Id.* (cleaned up). Rule 404(b) "evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *Beckelheimer*, 366 N.C. at 130, 726 S.E.2d at 159 (citation omitted).

Evidence of prior acts is properly admitted under Rule 404(b) where (1) the evidence has "probative value beyond showing the defendant has the propensity or disposition to commit an offense of the nature of the crime charged"; (2) the prior acts

are "similar enough to the charged crime to distinguish the acts from any generalized commission of the crime"; and (3) the prior acts are "temporally proximate to the presently charged act." *Jones*, 288 N.C. App. at 181, 884 S.E.2d at 789 (cleaned up).

At issue in the present case are the first and second requirements: whether the evidence of the prior acts "ha[s] probative value beyond showing . . . [D]efendant ha[d] the propensity or disposition to commit an offense of the nature of the crime charged" and whether the prior acts are "similar enough to the charged crime to distinguish the acts from any generalized commission of the crime." *Id.* (cleaned up).

"Acts need not rise to the level of the unique and bizarre to be sufficiently similar for purposes of Rule 404(b). Instead, the prior acts are sufficiently similar if there are some unusual facts present in both crimes that would indicate that the same person committed them." *State v. Maney*, 299 N.C. App. 108, 113, 917 S.E.2d 328, 335 (2025) (cleaned up), *disc. review denied*, ___ N.C. ___, 926 S.E.2d 741 (2026). "Additionally, we focus not on the differences between the two acts but the similarities." *Id.*

Defense counsel filed a pretrial motion in limine to exclude certain evidence, including "[p]rior or subsequent allegations of assaultive behavior by . . . [D]efendant, including the allegations of assault of Payne-Daughtry on November 21, 2021." The State proffered the evidence for the purpose of showing "malice . . . coupled with criminal intent." On 10 December 2024, Defendant's motion came on for hearing. The trial court heard arguments from counsel and then denied the motion:

In consideration of the motion . . . , the [c]ourt, having considered 404(b), also the evidence that's being offered is received solely for the purpose of showing exception to the 404(b) evidence as [it] relates to intent. The [c]ourt will rule that the evidence will only be considered for that purpose to show intent. The [c]ourt will find that it is relevant, consider[ing] the similarity of the facts as it relates to what is being alleged based upon what the witnesses provided . . . .

. . . [W]hether or not it's relevant to the allegations as it relates to what occurred on or about November the 20th, 2021, the [c]ourt will also find that it's not being admitted to show that . . . [D]efendant committed the crime or [had] propensity to actually commit that crime and that it's not an indication of character of [Defendant]. This [c]ourt having considered the evidence, also . . . would find that the probative value is [not] outweighed by the prejudicial effect, and therefore, allow[s] the evidence to prove intent based upon what is alleged by the witnesses that were planning to take the stand as it relates to the character evidence as it relates to 404(b).

The court entered an order to this effect on 14 January 2025.

On appeal, Defendant argues that the evidence of the Payne-Daughtry assault "was not probative of any relevant issue and served no other purpose than to suggest to the jury that [he] had a tendency to be violent and acted in conformity with that tendency the day that Raymon was fatally injured." Defendant additionally contends that the "only similarity" between the attacks on Payne-Daughtry and Raymon was that they were both "assaults," and that there was "no 'unusual fact' or 'particularly similar act'" to connect the two attacks. The State asserts that the evidence was introduced "for the purpose of showing criminal intent, particularly where Defendant

claimed to police that Raymon had fallen and hit his head, and that the injury stemmed from an accident" and that "there were key similarities" between the attacks.

At trial, Payne-Daughtry testified that he was present when Defendant attacked Raymon and described the circumstances:

> [Defendant] comes in there with the paddle, and he just ran in there, and then the next thing you know, all you hear is a bunch of knocking. Just knocking all in the room. All I hear is stop, stop, calm down, knock it off, you know. And then, all of [a] sudden, it just got quiet.

When Payne-Daughtry entered the room after the attack, "there was blood just all over the walls." He recalled that before the attack, Raymon had been unharmed, but when he went into the room after the attack, Raymon was on the floor "laying motionless" with "blood just gushing all over his face." Defendant instructed him: "[I]f anybody asks, say [Raymon] fell down the steps."

When Defendant attacked Payne-Daughtry on 27 November, he "just grabbed" him and "slung [him] on the ground." Then Defendant "started wailing on [his] face" and "head-butted" him.

Defendant's instruction to Payne-Daughtry to "say [Raymon] fell down the steps" was sufficient evidence of intent—as the trial court found in its ruling. We also note the presence of similarities between Defendant's attacks on Raymon and Payne-Daughtry: (1) the attacks occurred at the same location—Defendant's house; (2) both Raymon and Payne-Daughtry resided with Defendant; (3) at the time of the incidents,

both Raymon and Payne-Daughtry were close in age; (4) on both occasions, Defendant abruptly attacked with no warning; and (5) both attacks were concentrated on the victim's upper body and resulted in visible injuries.

Accordingly, the Rule 404(b) evidence had "probative value beyond showing . . . [D]efendant ha[d] the propensity or disposition to commit an offense of the nature of the crime charged," that is, to show intent. *Jones*, 288 N.C. App. at 181, 884 S.E.2d at 789 (cleaned up). Furthermore, there were "some unusual facts present in both crimes that would indicate that the same person committed them." *Maney*, 299 N.C. App. at 113, 917 S.E.2d at 335 (citation omitted). Thus, the trial court did not err in admitting the Rule 404(b) evidence of Defendant's attack on Payne-Daughtry.

### 3. Rule 403

Defendant further contends that "[i]f this Court were to find that [Payne-Daughtry]'s testimony overcame the Rule 404(b) hurdle, the testimony still should have been excluded under Rule 403" in that the admission of the Rule 404(b) evidence "clearly prejudiced" him.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. As our Supreme Court has explained, "[i]t goes without saying that evidence probative of the State's case is always prejudicial to the defendant, but this is not the threshold for

exclusion. Rather, it must be unfairly prejudicial in that it has an undue tendency to suggest decision on an improper basis." *State v. Gillard*, 386 N.C. 797, 816, 909 S.E.2d 226, 248 (2024) (cleaned up).

In the case at bar, the trial court reviewed testimony of the attack on Payne-Daughtry during voir dire, heard the arguments of counsel regarding the evidence, and provided its rationale for denying Defendant's motion in limine to exclude the evidence. Additionally, the court delivered a limiting instruction to the jury:

> Evidence has been received tending to show prior bad acts of violence. This evidence was received solely for the purpose of showing . . . [D]efendant had a motive for the commission of the crime charged in this case, that . . . [D]efendant had the intent which is a necessary element of the crime charged in this case. If you believe this evidence, you may consider it, but only for the limited purpose for which it was received. You may not consider it for any other purpose.

It is clear that "the trial court was aware of the potential danger of unfair prejudice to Defendant and was careful to give a proper limiting instruction to the jury." *Maney*, 299 N.C. App. at 117, 917 S.E.2d at 338 (cleaned up). The "court's decision was the result of balancing the potential of unfair prejudice against the probative value of the evidence and [wa]s therefore not an abuse of discretion." *Id.* at 118, 917 S.E.2d at 338.

Accordingly, we conclude that the trial court did not err under Rule 404(b) or Rule 403 by admitting evidence of Defendant's attack on Payne-Daughtry.

**B. Lay Witness Testimony**

Defendant next argues that "the trial court committed reversible error by permitting [a] lay witness . . . to testify [as] to her opinion on bloodstain evidence."

### 1. Standard of Review

This Court reviews a trial court's admission of evidence "for abuse of discretion, looking to whether the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Williams*, 363 N.C. 689, 701, 686 S.E.2d 493, 501 (2009) (cleaned up), *cert. denied*, 562 U.S. 864, 178 L. Ed. 2d 90 (2010).

### 2. Analysis

Lay witness testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701.

"It is well established that under this rule, a witness may state the instantaneous conclusions of the mind as to the appearance, condition, or physical state of things, derived from observation of a variety of facts presented to the senses at one and the same time." *State v. Mills*, 221 N.C. App. 409, 414, 726 S.E.2d 926, 930 (cleaned up), *disc. review denied*, 366 N.C. 247, 731 S.E.2d 427 (2012). "[T]his Court has repeatedly held that the ability of a witness to accurately assess the facts of a situation is a question of credibility rather than a question of admissibility." *State v. Morrison*, 272 N.C. App. 656, 662, 847 S.E.2d 238, 243 (cleaned up), *disc. review*

*denied*, 376 N.C. 549, 851 S.E.2d 48 (2020).

CSI Forensic Specialist Leonard testified at trial regarding the bloodstains she observed on a wall, an attic door, a trash bag of clothing, and a chair in a bonus room over the garage, where the attack occurred. Leonard "specialize[d] in investigating homicide crime scenes and other large-scale crime scenes" and that she had "twenty-plus years" experience. She was "a certified crime scene investigator with the International Association for Identification" and had "hundreds of hours of training" from seminars and "the Justice Academies."

Over Defendant's objection, Leonard testified that the bloodstains on the attic door, as well as other "small apparent bloodstains" in the room, were "transfer" stains. Transfer stains are created when "an object that was already stained in blood [comes] in contact with the wall" rather than being created when the object hit the attic door and then bled.

The admission of lay opinion testimony of police officers and crime scene technicians, when based on the officer's or technician's personal observations and training and experience, is routinely upheld by our appellate courts. Our Supreme Court "has held that the testimony of an investigating officer was properly admitted at trial where it was based on his personal observations and helpful to a clear understanding of his testimony concerning the facts in question." *State v. Delau*, 381 N.C. 226, 237, 872 S.E.2d 41, 48 (2022) (cleaned up); *see State v. Dickens*, 346 N.C. 26, 46, 484 S.E.2d 553, 564 (1997).

Here, Leonard's testimony "was based on [her] personal observations" and it was "helpful to a clear understanding of [her] testimony concerning the facts in question." *Delau*, 381 N.C. at 237, 872 S.E.2d at 48 (cleaned up). As such, the trial court properly admitted her testimony.

Defendant further asserts that he was prejudiced by the admission of Leonard's testimony.

"A defendant is prejudiced by evidentiary error when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." *Id.* (cleaned up). "The burden of showing prejudice under [N.C. Gen. Stat.] § 15A-1443(a) is upon the defendant." *Id.* (cleaned up); *see* N.C. Gen. Stat. § 15A-1443(a).

Assuming, *arguendo*, that it was error for the court to admit Leonard's testimony that the blood that she observed in the bonus room—which analysis proved to be Raymon's—appeared to have been transferred there after injury, Defendant cannot show prejudice.

Raymon's brother, Jose Meza, testified at trial that Defendant was "very, very violent." Raymon had told Meza that Defendant had "attacked [him] while [he was] sleeping, and he was choked out so much to where he was coughing up blood, and he was being punched in the face." On one occasion, Meza and Luis Gonzalez, a close friend of Raymon's, saw Defendant assault Raymon and push him against a window, breaking the glass. Gonzalez testified that he witnessed multiple incidents where

Defendant assaulted Raymon, resulting in "cuts and bruises."

Stephen Farrell, a neighbor, testified at trial that in August 2021, Raymon told him that "his dad had beat him up pretty bad and choked him." Farrell saw Raymon later and "his face was really swollen, and he had a black eye." Raymon's manager testified at trial that Raymon would come to work with "black eyes" and "bruises"; Raymon told her that Defendant was "always fighting" him.

Payne-Daughtry testified that Defendant was regularly "angry" and "abusive." He recalled that on 20 November 2021:

> [Defendant] comes in there with the paddle, and he just ran in there, and then the next thing you know, all you hear is a bunch of knocking. Just knocking all in the room. All I hear is stop, stop, calm down, knock it off, you know. And then, all of [a] sudden, it just got quiet.

The forensic pathologist who performed Raymon's autopsy testified that Raymon suffered a skull fracture and a laceration to the back of his scalp, which "indicate[d] at least one impact, one blow to the right back of the head." She further testified that there was significant blunt force applied to the back of Raymon's head, "much more forceful than a simple fall," and so substantial that it resulted in "injury to the brain matter on the back and the front besides the internal bleeding in the subdural compartment on both sides as well as in that subarachnoid kind of space on the right side." Raymon died from "complications of blunt force injury to the head."

The State presented ample evidence that Defendant had a long history of abuse toward Raymon and that he had assaulted Raymon on 20 November 2021, resulting

- 15 -

in Raymon's death. Accordingly, we conclude that, even assuming the trial court erred in admitting the testimony of CSI Forensic Specialist Leonard, Defendant cannot show "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." *Id.* (cleaned up).

### III.    Conclusion

For the foregoing reasons, we conclude that Defendant received a fair trial, free from prejudicial error.

NO ERROR.

Judges FLOOD and STADING concur.

Report per Rule 30(e).